[Civ. No. 14120. Second Dist., Div. Three. Mar. 24, 1944.]

CLARENCE V. WALKER, Appellant, v. WALTER GREENBERGER et al., Respondents.

Arthur A. Jones for Appellant.

Sidney A. Moss for Respondents.

WOOD (Parker), J.—In this action for damages for personal injuries sustained as a result of slipping and falling on the floor of a vegetable-washing-and-cutting room in the rear of a public market, plaintiff appeals from a judgment of nonsuit. The trial proceeded before a jury.

Plaintiff was an employee of a meat market which was a department of a general retail food market. Another department therein was a vegetable market. Said departments were separately owned and operated. Defendant Wally's Gardens, Ltd., a corporation, owned the vegetable market. Defendant Saylor's Ranch Market, a corporation, owned the general market building. Defendant Greenberger was the president of both corporations. The general market building was located at the southeast corner of an intersection. The entire front of the building, a distance of approximately 136 feet, and the west side of the building, for a distance of approximately 20 feet from the front, were open. It was the type of market generally referred to as an open market. The vegetable market occupied the west front corner of the market, and the meat market was in the west rear corner thereof.

About 9 a. m. on September 2, 1941, the date of the injury, plaintiff went to the vegetable market for the purpose of buying parsley or greens to garnish the meats in the meat market. When he asked the employee in the vegetable market for ''greens to put in between the meat,'' the employee told him ''to go in the back and get them and not disturb the display [referring to the vegetable display in front of the market].'' The place ''in the back,'' referred to by the employee, was the ''back room'' or ''cutting room'' of the vegetable department, which room adjoined the rear or south wall of the meat market. One entrance to the back room was on the west side of the building about 20 feet south of the rear wall of the meat market and about 50 feet from the front of the vegetable market. Another entrance was at the rear of the building. In order to enter that room it was necessary to go upon the sidewalk which adjoined the west side of the building or to go to the rear of the building. The side entrance was a door about

3 feet wide and 6 feet high. The dimensions of the side door and the distance from the front of the vegetable market to the side door do not appear specifically in the evidence, but photographs received in evidence indicate that the estimates herein stated, upon comparison with the known distance of 20 feet above referred to and shown in a photograph, are approximately correct. The floor of that room was "medium smooth" and was "something like asphalt."

After said employee told plaintiff to go to the back room, the plaintiff walked from the front of the vegetable market and entered the back room through the side door. No one was in there when he entered or while he was there. He proceeded therein for a distance of approximatly 4 feet to a stack of crates of greens by the left wall. He obtained 6 bunches of greens from the top crate which was about 3 feet above the floor, and as he was turning around to his left to leave the room, he slipped, fell, and broke his right wrist.

There was no artificial light in the room, but plaintiff "could see," and there was nothing to obstruct his view. He was wearing rubber heels on his shoes. Plaintiff testified that as he walked into the room on the date of the accident: he knew it was a vegetable-cutting room and that many of the vegetables were washed there; he saw "quite a few cuttings" on the floor; that an area on the floor about 7 feet square was covered by celery leaves, celery stalks, lettuce leaves, cabbage leaves, vegetables, and cuttings; that "two-thirds of it [the space on the floor] was covered and the other was scattered around, celery stalks, cabbage leaves, and so on"; that such cuttings "were laying around in piles," and "there was quite a few piles around"; that the depth of the piles "might have been ten inches in some places, an inch and a half in other places, and an inch in other places"; that water "was all over the floor from the washing and cutting"; and he "was looking at the merchandise." He testified further: "Q. [by attorney for defendants] What was the condition of the floor as you noticed it when you walked in there on the morning of September 2? Was anything on the floor? A. I saw quite a few cuttings. Q. There were celery leaves, lettuce leaves, cabbage leaves, and wet all over? A. Yes." He also testified that the point where he slipped, "right in that spot," was covered with vegetable leaves. The trial judge asked the plaintiff as follows, referring to the date of the accident: "Did you find any place on the floor that was not cov-

ered with scraps of vegetables or water on the floor?''
Plaintiff answered: ''Probably a few places.'' The trial
judge asked further: ''Did you see any spots without any
coverage either of water or vegetables that particular morn-
ing?'' Plaintiff answered: ''I really don't recall whether
there was or not.'' Plaintiff testified further: ''Q. [by attor-
ney for plaintiff] Mr. Walker, when you walked in there that
day, did you see that there was water underneath the cut-
tings? A. After I fell I seen there was water. Q. Before you
fell you didn't know there was any water underneath those
greens? [Objection which was overruled.] A. No.''

Plaintiff also testified that: He had been employed in the
meat market 10 months prior to the accident, and every day
during that period of time except his ''day off'' (Wednesday)
he would get the greens from the vegetable market and pay
for them. About one-half or three-fourths of the times he
went for greens he went into the cutting room to get them.
He was entirely familiar with the cutting room. Generally
there was a lot of refuse and a lot of water on the floor. In the
mornings that floor was always strewn with cuttings. About
three-fourths of the times during the 10 months' period when
he went into that room there were cuttings on the floor.
''Every time I went in there it [the floor] was almost always
wet.'' ''They had a tub right there with water in it all the
time.'' He testified further: ''Q. [by attorney for defen-
dants] So that every morning when you went in there it was
always wet, and there were vegetable stalks around on the
floor? A. Yes. Q. And that was the condition when you
went in there on September 2, 1941? A. Yes. Q. Now, there
was not anything to obstruct your view as you walked in
there, was there? You could see all right, couldn't you? A.
Yes. Q. And in order to get to those crates, you had to walk
over these cutting places? A. Sometimes. Q. On this particu-
lar morning, September 2, 1941? A. I don't recall, but I
probably walked over . . . The Court: About how often take
that ten months' period . . . what proportion did you have
to walk over green vegetables to get the vegetables you wanted
. . . half the time, three quarters of the time or what? A. I
would say half the time. Judge, I really don't know. I can't
recall it.'' He also testified: ''Q. [by attorney for plaintiff]
On the different occasions when you went in there in the past,
was the floor dry at times? A. Sometimes it was, and some-
times it was wet. Q. Would you say it was dry half the time,

more than half or not? A. No, not in the morning. Q. About fifty-fifty, or what? A. Certain times it might have been dry.''

The testimony of plaintiff therefore shows that he had gone into the back room for greens 100 or 150 times. (He was employed there 10 months or 40 weeks or 280 days. He had one ''day off'' each week and presumably he did not work on Sunday, and therefore he actually worked there 5 days each week for 40 weeks or 200 days. He went into the back room on one-half or three-fourths of the days he worked there, or 100 or 150 days.) His testimony also shows that he walked over greens in the back room 50 or 75 times. (His estimate was that he walked over the green vegetables about one-half of the times he went in there.) His testimony shows further that cuttings were on the floor about three-fourths of the times he was in that room, or 75 or 110 times, and generally there was a lot of refuse and water on the floor. Apparently the floor space, except the space occupied by the vegetable crates and the washing and cutting equipment, was generally covered with a combination of deep piles of vegetable cuttings, scattered vegetable leaves and stalks, and water.

Appellant (plaintiff) asserts that he established a prima facie case of negligence on the part of defendants. He asserts further that defendants, having specifically invited him to go in the back cutting room to select the merchandise, owed him the duty of exercising ordinary care to keep the aisles therein in a safe condition.

 Plaintiff was an invitee of the defendant Wally's Gardens, Ltd., and said defendant owed him the duty of exercising ordinary care. Plaintiff knew that back room was the vegetable-washing-and-cutting room, and that it was used daily as such. He also knew that the floor therein was practically covered, in depths varying from one to several inches, with trimmings from green vegetables. Although he did not see water under the vegetable trimmings before he fell, he knew there was a lot of water at various places on the floor. Irrespective of whether water was under the green vegetable trimmings, he was chargeable with knowledge that such green vegetable trimmings would cause a condition of slipperiness on the floor. Plaintiff acquired knowledge of the generally littered and wet condition of the floor by almost daily observation and use of it over a period of several months. Plaintiff had full knowledge of the condition of the floor.

If a danger is so apparent that the invitee can reason-

ably be expected to notice it and protect against it, the condition itself constitutes adequate warning. (*Shanley* v. *American Olive Co.* (1921), 185 Cal. 552, 555 [197 P. 793]; *Matherne* v. *Los Feliz Theatre* (1942), 53 Cal.App.2d 660, 666 [128 P.2d 59].) "The true ground of liability rests on the proprietor's superior knowledge of the perilous instrumentality and the danger therefrom to invitees, over that of the invitee." (*Crawford* v. *Pacific States S. & L. Co.* (1937), 22 Cal.App.2d 448, 449 [71 P.2d 333]; *Touhy* v. *Owl Drug Co.* (1935), 6 CalApp.2d 64, 66 [44 P.2d 405].) "There is no liability for injuries from the dangers that are obvious, or as well known to the person injured as to the owner or occupant." (*Mautino* v. *Sutter Hospital Assn.* (1931), 211 Cal. 556, 561 [296 P. 76].) It does not appear that the defendants' knowledge of the condition of the floor of the back room was superior to that of the plaintiff. A statement in *Mautino* v. *Sutter Hospital Assn., supra*, at page 560, is applicable here: "If it was negligence for the defendant to maintain the floor in the condition described by the plaintiff, there appears to be no escape from the conclusion that it was negligence for the plaintiff, with full knowledge of such condition, to continue in the use thereof."

The case of *Tuttle* v. *Crawford* (1936), 8 Cal.2d 126 [63 P.2d 1128], upon which plaintiff relies is distinguishable from the present case. In that case the plaintiff slipped on a wet area in an aisle in the market proper. It was claimed that particles of vegetable matter were also in the wet area. In holding that the question as to negligence in maintaining the floor was one of fact for the jury, the court said (p. 128): "[T]here seemed not to be anything so *unusual* or *striking* about it [the wet area] as to have especially attracted her attention as she passed it when she proceeded to the milk refrigerator or on her return to the vegetable section." (Italics added.) The court said further (p. 130): "The injured woman, in going to the refrigerator, passed near the discolored area, but as there was nothing about it *to warn* her of possible danger, her attention was not specifically directed to it and if she noticed it at all she probably did so in a subconscious fashion." (Italics added.) The court also said (p. 130): "The fact that the attention of persons who visit public markets is attracted by the display of the wares offered for sale and more or less absorbed by the transactions which they have in mind would seem to increase the necessity of

exercising care to the end that the floor spaces and aisles allotted to the use of customers should be made safe and kept fit for such purpose." In the present case, as aforesaid, the plaintiff did not fall in an aisle in the display part of the market, but fell in a back room which plaintiff had known for several months was allotted for, and actually used as, a room for washing and trimming vegetables preparatory to placing them in the display part of the market. He also knew that the ordinary use of that room for its intended purpose caused an accumulation of green vegetable matter and water on practically the entire open floor space of the room to such an extent that obviously there was something "unusual" about the condition of the floor "to warn" him "of possible danger."

Plaintiff asserts further that the trial court erred in excluding his offered testimony of several witnesses to the effect that they had purchased vegetables in that back room on various occasions at the specific invitation of the owner or employee of the vegetable market to purchase vegetables there. Such evidence was material on the issue as to whether plaintiff's status was that of invitee or licensee. If there was no liability to plaintiff by reason of the obvious condition of the floor, even if he be considered an invitee, it was immaterial whether there was a custom of making sales in that room which would tend to show that plaintiff was an invitee.

Plaintiff contends further that the trial court erred in not permitting counsel for plaintiff, in questioning the prospective jurors concerning their qualifications, to ask a certain juror or any juror what his occupation was. That contention is based upon proceedings in the trial court as shown by the following excerpt from the transcript: "Q. [by Mr. Jones, attorney for plaintiff] Your occupation, Mr. Cunningham [a prospective juror]? The Court: That is wholly immaterial, Mr. Jones. Mr. Jones: It is very important, Your Honor. The Court: I will not permit it in my courtroom, if you have any general occupation you may ask, but the matter of occupation is wholly immaterial in a challenge for cause." The transcript shows further as follows: "Whereupon the same question was asked of other jurors on the examination for cause and the Court ruled that such an examination for cause would not be permitted in that Court." The ruling was erroneous. Plaintiff was entitled to reasonable interrogation of prospective jurors as a basis for determining whether he should challenge the juror for cause or

whether he should exercise his right to challenge the juror peremptorily. It is reasonable to assume that an answer to that question might have furnished a basis for further questions and answers relative to grounds for challenge for cause, which might have established a basis for such a challenge.

Irrespective of a challenge for cause, the question was a reasonable one to aid plaintiff in determining whether to exercise a peremptory challenge. The error of the trial court was not prejudicial in this case, however, for the reason defendants' motion for a nonsuit was granted.

The judgment is affirmed.

Desmond, P. J., and Shinn, J., concurred.