[No. A055844. First Dist., Div. Three. Feb. 26, 1993.]

INDUSTRIAL INDEMNITY CO., Plaintiff and Appellant, v. TOUCHE ROSS & CO., Defendant and Appellant.

**COUNSEL**

Steefel, Levitt & Weiss, Laura R. Craft and Peter D. Teague for Plaintiff and Appellant.

Cooley, Godward, Castro, Huddleson & Tatum, Paul A. Renne, William S. Freeman, Vernon M. Winters and Yvonne Gonzalez Rogers for Defendant and Appellant.

**OPINION**

**CHIN, J.**—Touche Ross & Co. (Touche) appeals from an order granting the motion of plaintiff and cross-appellant Industrial Indemnity Co. (Industrial) for a new trial on the issue of damages. It contends that the trial court abused its discretion in granting the motion. Applying the Supreme Court's recent

decision in *Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370 [11 Cal.Rptr.2d 51, 834 P.2d 745], we agree. Therefore, we reverse the new trial order. We also reject Industrial's cross-appeal from the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Buttes Gas and Oil Co. (Buttes) was a publicly traded company which leased drilling rigs to major oil companies, drilled for oil and gas, and owned oil and gas, agricultural and mineral properties. For many years, Touche conducted annual audits of Buttes's general purpose financial statements and prepared standard audit opinions for Buttes. In March 1984, Touche issued an unqualified or "clean" audit opinion with respect to Buttes's 1983 financial statements.

Dimensional Credit Corporation (DCC) was organized to make short-term, unsecured loans at a reasonable cost to small- and medium-sized, publicly held companies like Buttes. DCC obtained capital to fund the loans by selling commercial paper to institutional investors. In making lending decisions, DCC used a quantitative credit model to screen out loan applicants on the basis of their creditworthiness. DCC developed the first version of its credit model during the spring of 1984.

To make its program work, DCC needed a surety to guarantee repayment of the commercial paper in the event of the borrower's default. On December 7, 1984, Industrial and DCC closed a "Surety Support Agreement" (dated as of Sept. 1, 1984) by which Industrial agreed to be surety for the program. Industrial also was a start-up investor in DCC.

The DCC credit committee, which DCC formed in the spring of 1984, began evaluating Buttes as a potential borrower in June 1984. To facilitate the process, Buttes supplied DCC with its 1983 financial statements and Touche's audit opinion. The credit committee conditionally approved Buttes in June 1984. However, in July, after revising the credit model, the credit committee rejected Buttes and deferred its further consideration pending additional investigation. In October, after again revising the model, the credit committee approved Buttes for a 60-day, $10 million line of credit.

On December 14, Buttes drew down the entire $10 million line of credit. DCC renewed the loan an additional 60 days in February 1985. In April 1985, because it had not received Buttes's 10-K for the 1984 fiscal year, it renewed the loan for only 30 days. After receiving the 10-K, DCC decided not to renew the loan and demanded repayment. Buttes defaulted, and Industrial, as surety, had to repay the holders of the commercial paper.

In May 1987, Industrial filed suit against Touche. The matter eventually went to trial in August 1991 on Industrial's first amended complaint. The court submitted the case to the jury on four theories: (1) professional negligence; (2) negligent misrepresentation; (3) intentional misrepresentation; and (4) fraudulent concealment. With respect to the professional negligence claim, the court also instructed on the affirmative defense of comparative negligence. The jury returned a general verdict for Industrial and awarded damages of $1.

Industrial made two posttrial motions. In one, it moved "for a new trial on damages, subject to additur; or for a new trial limited to apportionment of fault; or alternatively, for a new trial on all issues." In the other, it moved for judgment notwithstanding the verdict on the negligent misrepresentation claim. After hearing, the trial court denied the latter motion. It granted in part the former motion, ordering a new trial "on the issue of damages only, unless . . . [Touche] files a consent to an additur to the damages awarded by the jury to the total sum of $9,095,000 . . . ."

Touche now appeals the order granting a limited new trial. Industrial has filed a "PRECAUTIONARY CROSS APPEAL" in which it asks that we reverse the judgment if we reverse the new trial order.

DISCUSSION

*Touche Appeal*

1. *Standard of Review*

 A trial court's decision to grant a new trial is a matter of discretion which we will not reverse absent abuse. (*Mazzota* v. *Los Angeles Ry. Corp.* (1944) 25 Cal.2d 165, 169 [153 P.2d 338].) Where, as here, the trial court's order grants a new trial only on the issue of damages, we review the evidence relating to both liability and damages to determine whether the order constitutes an abuse of discretion. (*Kralyevich* v. *Magrini* (1959) 172 Cal.App.2d 784, 791 [342 P.2d 903]; *Harper* v. *Superior Air Parts, Inc.* (1954) 124 Cal.App.2d 91, 92 [268 P.2d 115].) If that evidence is insufficient as a matter of law to support a judgment in favor of the moving party, we must reverse. (*Mazzota, supra,* at p. 168; *Salvetti* v. *Byrd* (1963) 222 Cal.App.2d 418, 421 [35 Cal.Rptr. 185]; *Kingen* v. *Weyant* (1957) 148 Cal.App.2d 656, 660 [307 P.2d 369]; *Martin* v. *Smith* (1951) 103 Cal.App.2d 894, 897 [230 P.2d 679].)

2. *Bily Applies Retroactively*

Because we must judge the sufficiency of the evidence against the applicable law, we must first determine what the applicable law is. *Bily* states the

law in California as it relates to accountants' liability to third parties. (*Bily* v. *Arthur Young & Co.*, *supra*, 3 Cal.4th 370.) It holds in part that accountants are not liable to third parties for general negligence, and expressly overrules *International Mortgage Co.* v. *John P. Butler Accountancy Corp.* (1986) 177 Cal.App.3d 806 [223 Cal.Rptr. 218], on this point. (*Bily*, *supra*, at p. 405, fn. 15.) The Supreme Court filed *Bily* on August 27, 1992, almost one year after the jury returned its verdict in this case. We must therefore decide whether *Bily* applies retroactively.[1]

■ "The general rule that judicial decisions are given retroactive effect is basic in our legal tradition." (*Newman* v. *Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978 [258 Cal.Rptr. 592, 772 P.2d 1059].) "With few exceptions and even after expressly considering suggestions to the contrary, California courts have consistently applied tort decisions retroactively even when those decisions declared new causes of action or expanded the scope of existing torts in ways defendants could not have anticipated . . . . [Citations.]" (*Id.*, at pp. 981-982.) At the same time, the Supreme Court has consistently "recognized the potential for allowing narrow exceptions to the general rule of retroactivity when considerations of fairness and public policy are so compelling . . . that, on balance, they outweigh the considerations that underlie the basic rule. A court may decline to follow the standard rule when retroactive application of a decision would raise substantial concerns about the effects of the new rule on the general administration of justice, or would unfairly undermine the reasonable reliance of parties on the previously existing state of the law. In other words, courts have looked to the 'hardships' imposed on parties by full retroactivity, permitting an exception only when the circumstances of a case draw it apart from the usual run of cases." (*Id.*, at p. 983.)

Applying these principles, the Supreme Court in *Newman* held that *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373], applies retroactively.[2] (*Newman* v. *Emerson Radio Corp.*, *supra*, 48 Cal.3d at p. 976.) It based its holding on the following factors: (1) *Foley* did not overrule a prior Supreme Court decision; (2) the doctrine that *Foley* overruled, although expressed in a consistent line of appellate cases, had stood for less than six years before the Supreme Court granted review on the issue; (3) the appellate cases applying the overruled doctrine either "uncritically adopted" it or engaged in "incomplete analyses"; (4) the purpose

---

[1]Because the parties had fully briefed this case prior to *Bily*'s publication, we requested, and the parties submitted, briefing as to *Bily*'s impact on this appeal and cross-appeal.

[2]*Foley* held that a wrongfully discharged employee cannot recover in tort for breach of the covenant of good faith and fair dealing. (*Newman* v. *Emerson Radio Corp.*, *supra*, 48 Cal.3d at pp. 975-976.)

behind the rule *Foley* announced was fully consistent with its retroactive application; (5) no one had acquired vested rights or entered into a contract based on the former rule; (6) *Foley* involved "not a matter of procedural interpretation but a substantive rejection of a form of recovery"; and (7) the number of retrials due to retroactive application would not seriously disrupt the administration of justice. (*Newman* v. *Emerson Radio Corp.*, *supra*, at pp. 986-992.)

██ The existence of similar factors in this case leads us to a similar conclusion regarding *Bily*. *Bily* does not overrule a prior decision of the Supreme Court. Nor does it even overrule a consistent line of appellate cases. Rather, it overrules a single appellate decision, *International Mortgage Co.* v. *John P. Butler Accountancy Corp.*, *supra*, 177 Cal.App.3d 806, which had stood for less than five years before the Supreme Court granted review in *Bily*. In *Bily*, the Supreme Court criticized the analysis in *International Mortgage Co.*, finding that the decision "fail[ed] to consider" the relevant policy factors and assumed, "[w]ithout support or analysis," that the concept of privity made no sense in any tort context. (*Bily* v. *Arthur Young & Co.*, *supra*, 3 Cal.4th at p. 405, fn. 15.) *Bily*'s goal of preventing liability out of proportion to fault (*id.*, at pp. 399-402) is fully consistent with its retroactive application. No one has acquired vested rights or entered into contracts based on the former rule.[3] *Bily* does not involve an issue of procedural interpretation, but is a substantive rejection of a form of recovery. Finally, the number of retrials due to *Bily*'s retroactive application will not seriously disrupt the administration of justice. Thus, as the Supreme Court found in *Newman*, we find here "no compelling reason to depart from the general rule of retroactive application of judicial decisions . . . . Nothing distinguishes the present matter from other cases in which [the Supreme Court] has delineated the scope of a cause of action or the relief available therefor to justify deviation from the usual rule." (48 Cal.3d at p. 993.) Accordingly, we hold that *Bily* applies retroactively.

---

[3]In *Newman*, the Supreme Court explained: "It is most unlikely that any employee in a pending wrongful termination case entered into his or her employment in reliance on the existence of a tort cause of action for breach of the covenant, and plaintiff here does not claim to have done so. [Citation.] . . . Rather, we are faced with the much more familiar situation in which a litigant may have entered into *litigation* in reliance on the existence of a cause of action which is subsequently rejected, limited or ruled out of existence by later case law." (*Newman* v. *Emerson Radio Corp.*, *supra*, 48 Cal.3d at pp. 989-990.) Similarly, we find it unlikely that lenders extended credit to companies in reliance on the existence of a negligence cause of action against the accountants who performed the annual audits for those companies. More particularly, the relevant acts regarding Industrial's claim all occurred before *International Mortgage Co.* established a third party's right to recover from an accountant for negligence, and the Supreme Court granted review in *Bily* before Industrial's case went to trial. Thus, Industrial cannot properly claim that it acted in reliance on *International Mortgage Co.*

### 3. *Industrial's Claims Fail as a Matter of Law*

Our application of *Bily* to this case requires reversal of the new trial order. *Bily* limits an auditor's liability for general negligence in the conduct of an audit of its client's financial statements "to the client[,] i.e., the person who contracts for or engages the audit services."[4] (*Bily* v. *Arthur Young & Co., supra,* 3 Cal.4th at p. 406.) Inasmuch as there is no evidence that Industrial or DCC contracted for or engaged Touche's audit services, Industrial cannot recover for general negligence.[5] *Bily* further holds that an auditor may be liable to certain third parties for intentional misrepresentation. (*Id.,* at pp. 414-415.) However, neither during posttrial proceedings in the trial court nor on appeal has Industrial urged that there is evidence to sustain a claim for intentional misrepresentation.[6] Therefore, we cannot sustain the new trial order on either a general negligence or intentional misrepresentation theory.

Finally, we must determine whether the evidence can sustain a judgment for Industrial on its negligent misrepresentation claim. *Bily* "adopt[s] the approach of Restatement Second of Torts section 552, subdivision (2) regarding the plaintiff or group of plaintiffs who may sue for negligent misrepresentation . . . ."[7] (*Bily* v. *Arthur Young & Co., supra,* 3 Cal.4th at p. 414.) That section limits the liability of "one who negligently supplies false information 'for the guidance of others in their business transactions' . . . to loss suffered: '(a) [B]y the person or one of a limited group of persons for whose benefit and guidance [the supplier] intends to supply the

---

[4]Although not relevant here, *Bily* also states that, in theory, an accountant could be liable to an express third party beneficiary of the audit engagement contract. (*Bily* v. *Arthur Young & Co., supra,* 3 Cal.4th at p. 406, fn. 16.)

[5]At oral argument, Industrial conceded that retroactive application of *Bily* bars its negligence claim.

[6]In moving for a new trial, Industrial argued only that "[t]he evidence in the trial record . . . on both professional negligence and negligent misrepresentation is solid and convincing . . . ." In moving for judgment notwithstanding the verdict on its negligent misrepresentation claim, Industrial explained that it had "alleged professional negligence and negligent misrepresentation by Touche," speculated that the jury "may have found Touche liable on Industrial's negligent misrepresentation cause of action," and stated that "[t]he only alternative construction of the verdict is that the jury found *for* Industrial on professional negligence, with nearly offsetting comparative fault; and *against* Industrial on the negligent misrepresentation cause of action." During the hearing on these motions, Industrial's counsel stated: "We haven't raised the other two causes of action at all in these motions. The concealment and intentional misrepresentation."

Consistent with these representations, in its opening brief on appeal, Industrial characterizes this action as a "malpractice and negligent misrepresentation case . . . ." In specifically addressing *Bily*'s relevance, Industrial states that "[t]he jury . . . heard evidence on two causes of action . . . : professional negligence and negligent misrepresentation . . . ." Industrial nowhere argues that we can affirm the new trial order based on intentional misrepresentation.

[7]All further section references are to the Restatement Second of Torts.

information or knows that the recipient intends to supply it; and (b) [T]hrough reliance upon it in a transaction that [the supplier] intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.' [Citation.] To paraphrase, a supplier of information is liable . . . to a third party only if he or she intends to supply the information for the benefit of one or more third parties in a specific transaction or type of transaction identified to the supplier." (3 Cal.4th at p. 392.)

*Bily* explains that this standard "seek[s] to identify a specific class of persons *and* a transaction that the supplier of information 'intends . . . to influence,' " so as to "confin[e] what might otherwise be unlimited liability to those persons whom the engagement is designed to benefit . . . ." (*Bily* v. *Arthur Young & Co., supra,* 3 Cal.4th at pp. 408-409.) It imposes liability where "the supplier undertakes to supply information to a third party whom he or she knows is likely to rely on it in a transaction that has sufficiently specific economic parameters to permit the supplier to assess the risk of moving forward." (*Id.,* at p. 409.) To achieve these aims, the test "creates *an objective standard* that looks to the specific circumstances (e.g., supplier-client engagement and the supplier's communications with the third party) to ascertain whether a supplier has undertaken to inform and guide a third party with respect to *an identified transaction or type of transaction.*" (*Ibid.*) There is no liability as a matter of law where "competent evidence does not permit a reasonable inference that the auditor supplied its report with knowledge of the existence of a specific transaction or a well-defined type of transaction which the report was intended to influence . . . ." (*Bily, supra,* at p. 414.)

 The record in this case establishes as a matter of law that Touche is not liable to Industrial for negligent misrepresentation. According to Industrial, "[f]or almost eighteen years, Touche did annual audits for Buttes . . . ." Under *Bily,* "an auditor retained to conduct an annual audit and to furnish an opinion for no particular purpose generally undertakes no duty to third parties. Such an auditor is not informed 'of any intended use of the financial statements; but . . . knows that the financial statements, accompanied by an auditor's opinion, are customarily used in a wide variety of financial transactions by the [client] corporation and that they may be relied upon by lenders, investors, shareholders, creditors, purchasers and the like, in numerous possible kinds of transactions.' " (*Bily* v. *Arthur Young & Co., supra,* 3 Cal.4th at pp. 393-394.) In this context, if the client obtains a bank

loan using the auditor's opinion, the auditor cannot be liable to the bank for negligent misrepresentation.[8] (*Id.*, at p. 394.)

■ The evidence in the record regarding Touche's knowledge of Industrial and DCC does not support a departure from this general rule as to Industrial. Industrial cites evidence that Touche "became aware in the latter part of 1984 . . . that there were some people from . . . Industrial Credit that were calling on [Buttes] about a prospective loan." However, there is no evidence that, at the time it issued its opinion in March 1984, Touche knew that Buttes intended to use the opinion to obtain a line of credit either from DCC or anyone else. On the contrary, the record shows: (1) DCC did not even approach Buttes about the loan program until April 1984, after Touche issued its opinion;[9] (2) DCC obtained the audit opinion from Buttes, not from Touche; and (3) when DCC first considered Buttes in June 1984, at which time it already had obtained the audit opinion, DCC was "still negotiating the terms of the [surety] agreement with Industrial," and the lending program was still "months and months away from [being] operational."[10] Thus, the evidence does not show that Touche either consented to or even knew of Buttes's submission of the audit opinion to DCC. At best, it

---

[8]Thus, Industrial's assertion that "[e]vidence was introduced at trial to show that at the time Touche signed the 1983 audit opinion . . . , it was fully aware that its client would be using the audited statements to borrow large sums of money,' " does not further its case. As *Bily* observes, "audits of financial statements and the resulting audit reports are very frequently (if not almost universally) used by businesses to establish the financial credibility of their enterprises in the perceptions of outside persons, e.g., existing and prospective investors, financial institutions, and others who extend credit to an enterprise or make risk-oriented decisions based on its economic viability." (*Bily* v. *Arthur Young & Co.*, *supra*, 3 Cal.4th at p. 382.) An accountant is liable where it intends that its representations "reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it." (§ 552, com. (h).) On the other hand, an accountant is not liable if it " 'merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon [the information] on the part of anyone to whom it may be repeated,' . . . ." (*Bily*, *supra*, at pp. 409-410, quoting § 552, com. (h); see also *First Nat. Bank of Commerce* v. *Monco Agency Inc.* (5th Cir. 1990) 911 F.2d 1053, 1061-1063 [rejecting argument "that all 'potential lenders' " of audited company "constitute a 'limited group' of informational recipients" under § 552].)

[9]Industrial conceded at oral argument that negotiations for Buttes's loan did not begin until after Touche signed the audit opinion.

[10]John McQuown, who was one of DCC's founding partners, testified that "[t]here was no program" in June and July 1984. Similarly, Michael Kieschnick, another of DCC's founders, testified that the credit committee's meetings in June, during which it initially approved the Buttes loan, "were in some sense practice sessions," and that "[w]e didn't even have loan documents for companies to sign." He described this period as "a time where we could reasonably consider options, try out different things, knowing that we weren't going to make a loan based on them right then." He further explained that, although the credit committee was meeting to approve or disapprove credit applicants, "every regional vice-president

brings Industrial within that "much larger class [of persons] who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it." (§ 552, com. (h).)

Nor is the evidence Industrial cites regarding transactions in which it did not participate sufficient to establish liability. Industrial cites evidence that Touche consented to Buttes's use of the audit opinion in connection with a preferred stock offering and a subordinated debenture offering. ██ However, *Bily* imposes liability only as to "a specific transaction or a well-defined type of transaction" that the auditor knows about and intends to influence in supplying its report. (*Bily* v. *Arthur Young & Co., supra,* 3 Cal.4th at p. 414.) Although the transaction giving rise to the lawsuit need not "be identical in all of its minute details" with the one the accountant intended to influence, it must be "substantially the same transaction or one substantially similar"; the question is "whether the departure from the contemplated transaction is so major and so significant that it cannot be regarded as essentially the same transaction." (§ 552, com. (j).) ██ We find that neither the preferred stock offering nor the subordinated debenture offering is sufficiently similar to Industrial's guarantee of DCC's line of credit to Buttes to establish liability.[11] (See *First Nat. Bank of Commerce* v. *Monco Agency Inc., supra,* 911 F.2d at pp. 1062-1063 [accountant who provided audit opinion for obtaining guaranteed loan not liable to bank

understood very clearly that we could not affect [*sic*] loans based on those. And they were told to tell the companies specifically that, that we were still in a startup [*sic*] phase. [¶] And so we took it very seriously, but no one should think that we were about to turn around and make a loan."

[11]At oral argument, Industrial conceded that the stock offering, as a sale of equity rather than an extension of credit, is not sufficiently similar to the DCC loan. It asserted, however, that the DCC loan is functionally the same as the debenture offering. Unfortunately for Industrial, the *evidence* it offered at trial was to the contrary. Its witnesses testified that the debenture sale made Buttes more creditworthy by generating money that was "in effect equity" or "quasi equity" to "cushion[ ]" DCC's short-term, unsecured loan and "to pay down some other debt." By contrast, Buttes's line of credit was simply a "working-capital short-term loan" that provided "debt capital" like a credit card. Moreover, Industrial argued that there was a "critical distinction . . . between short-term debt and long-term debt," specifically with respect to their approval processes. It offered evidence that, because a short-term lender "expects repayment in the near term," it "look[s] primarily . . . to . . . current assets . . . ." On the other hand, because repayment of a long-term loan occurs "over a long period of time" and depends on events happening "well into the future," a potential long-term lender must do "considerably more investigation" and is more likely to consult with or be an expert in the loan applicant's business. Thus, from Touche's point of view, the DCC loan involved risks different from those Touche understood it had accepted in allowing Buttes to use the audit opinion to sell the debentures, which were long-term obligations due in 10 years. (See *Bily* v. *Arthur Young & Co., supra,* 3 Cal.4th at p. 409 [no liability if transaction's nature and extent are not within "sufficiently specific economic parameters to permit the [information] supplier to assess the risk of moving forward"]; 6A Fletcher, Cyc. Corporations (1989 rev.) § 2635, p. 6 [obligations that do not fall due in less than 10 years are generally viewed as long-term debt; debentures are long-term securities].)

making unguaranteed loan]; § 552, illus. 14 [accountant who knows only that client intends to use audit opinion to obtain a line of credit for purchasing goods is not liable to one who purchases controlling interest in client's stock]; § 552, com. (j) [accountant who knows only that client intends to use audit opinion to obtain a particular line of bank credit is not liable to wholesale merchant who supplies client goods on credit].) Accordingly, Touche cannot be liable to Industrial for negligent misrepresentation.

In conclusion, as a matter of law, the evidence is insufficient to support a judgment for Industrial against Touche on any of Industrial's causes of action. Therefore, we must reverse the order granting a new trial.[12]

### Industrial's Cross-appeal

Since we are reversing the new trial order, we must also address Industrial's cross-appeal from the judgment awarding it only $1 in damages. Industrial argues that the trial court erred in two respects: (1) instructing the jury that Industrial's right to recover was as a surety/subrogee of DCC and that DCC's negligence "could therefore be imputed to Industrial for purposes of Touche's comparative fault defense", and (2) denying Industrial's request to excuse a juror for cause.

Our disposition of Touche's appeal necessarily disposes of these contentions. Because, under *Bily*, Industrial cannot recover on a negligence theory, and because the evidence is insufficient as a matter of law to support recovery on any other theory, the instruction relating to the effect of DCC's negligence on Industrial's right to recover could not have prejudiced Industrial, even if we assume that the trial court erred in giving it.[13] Likewise, because the evidence is insufficient as a *matter of law* to support a verdict for Industrial, and therefore there was no function for the jury to perform, the denial of Industrial's juror challenge could not have prejudiced Industrial, even if we assume that the ruling was erroneous. (*Walker* v. *Greenberger* (1944) 63 Cal.App.2d 457, 463-464 [147 P.2d 105] [court's error in preventing plaintiff from asking questions that might have resulted in jurors' dismissal for cause was harmless where nonsuit granted]; *Willis* v. *Western Hospital Association* (1947) 67 Idaho 435 [182 P.2d 950, 957] [if court erred in denying juror challenge, error was harmless where nonsuit was granted];

---

[12]Given our conclusion, we need not address Touche's arguments that we should review the new trial order as a judgment notwithstanding the verdict, that the order fails to comply with statutory requirements, and that the trial court further erred in limiting the scope of the new trial to damages. However, notwithstanding our conclusion, we cannot reverse the judgment because Touche did not appeal from it.

[13]Industrial conceded at oral argument that retroactive application of *Bily* disposes of this issue.

*Lewis* v. *Washington Ry. & Electric Co.* (D.C. Cir. 1923) 285 F. 977, 979-980 [52 U.S.App.D.C. 243] [where defendant was entitled to directed verdict, denial of juror challenge could not have prejudiced plaintiff]; *Walton* v. *Lindsay Lumber Co.* (1905) 145 Ala. 660 [39 So. 670, 671] [if court erred in finding juror competent, error was harmless where, given the evidence, jury "had no function to perform"].)

The order granting a new trial is reversed. The judgment in favor of Industrial for $1 is affirmed. Industrial shall pay Touche's costs on appeal.

Merrill, Acting P. J., and Werdegar, J., concurred.