[No. B146165. Second Dist., Div. Seven. Oct. 23, 2001.]

NUTMEG SECURITIES, LTD., Plaintiff and Appellant, v. McGLADREY & PULLEN, Defendant and Respondent.

1436

**COUNSEL**

Wehner & Perlman, Rodney M. Perlman and Stephen T. Hodge for Plaintiff and Appellant.

Keker & Van Nest, Christopher C. Kearney, Steven A. Hirsch and Stacey L. Wexler for Defendant and Respondent.

**OPINION**

**JOHNSON, J.**—The underwriter of an initial public offering of a now-defunct corporation brought this action for damages against the corporation's accounting firm, alleging the firm prepared false and misleading financial and audit reports knowing and intending the underwriter would rely on these reports in agreeing to underwrite the offering. The trial court applied a *"Bily* club"[1] to the action and sustained the accounting firm's demurrer without leave to amend. We reverse.

---

[1]See *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370 [11 Cal.Rptr.2d 51, 834 P.2d 745, 48 A.L.R.5th 835] (hereafter *Bily*). In *Bily,* our Supreme Court held an accounting firm could

## FACTS AND PROCEEDINGS BELOW

The complaint alleges in relevant part:

Plaintiff Nutmeg Securities, Ltd. (Nutmeg) is in the business of providing financial advice and underwriting for companies "going public" with their stock through an initial public offering (IPO).[2] Defendant McGladrey & Pullen (McGladrey) is a firm of certified public accountants which performed accounting and auditing services for American Diversified Holdings, Inc. (AmDiv) in connection with AmDiv's IPO.[3]

In the fall of 1997 McGladrey and AmDiv devised a scheme by which AmDiv could launch its IPO based on false information contained in its financial reports.[4] At the heart of this scheme was AmDiv's representation it

---

never be liable to third parties for simple negligence in preparing an independent audit of a client's financial statements. (*Id.* at p. 376.) The court did agree, however, an accounting firm may "be held liable for negligent misrepresentations in an audit report to those persons who act in reliance upon those misrepresentations in a transaction which the auditor intended to influence." (*Ibid.*) Later in this opinion, we will refer to this as the "intended reliance" rule. The court also held an accounting firm may be held liable "to reasonably foreseeable third persons for intentional fraud in the preparation and dissemination of an audit report." (*Ibid.*)

[2]Although technically an underwriter is not required for an IPO, traditionally a company goes public by retaining an underwriter such as Nutmeg to price and sell shares of the company's common stock to institutions and the general public. (Ferris et al., *An Analysis and Recommendation for Prestigious Underwriter Participation in IPOs* (1992) 17 J. Corp. L. 581, 582-583 (hereafter Ferris).) In some cases the underwriter will purchase the entire offering for resale to the public; in other cases the underwriter will purchase only a percentage of the offering. (Ferris, at pp. 583-584.) In either case, the underwriter has both monetary and reputational capital at risk in the offering and is keenly interested in the financial soundness of the company. The company is interested in producing a solid financial report in order, among other things, to attract a prestigious underwriter whose involvement will lend credibility and interest to the IPO. (Ferrris, at p. 584.) For a further discussion of the role of an underwriter in an IPO see Bloomenthal and Wolf (1998) Securities and Federal Corporate Law, Role of the Underwriter, section 8:1.

[3]The complaint also named as defendants Peter Hartmann, chairman of the board of AmDiv, Kenneth Stoll, a partner in McGladrey; Michael B. Jeffers, a partner in the law firm of Jeffers, Wilson, Shaff & Falk (JWSF); and the law firm itself. Unless otherwise noted, references to AmDiv and McGladrey include Hartmann and Stoll respectively.

[4]Nutmeg alleges: "[I]n the fall of 1997 Hartmann, using the promise of substantial future business, convinced defendants McGladrey & Pullen, Stoll, Jeffers and JWSF to ignore their professional obligations in favor of devising a scheme by which Hartmann could launch his plan to sell stock publicly in American Diversified without American Diversified ever undergoing the professional scrutiny that was required to ensure that plaintiff, and the public in general, were protected from the false information contained in American Diversified financial reports."

possessed $11 million in assets derived from the sale of a bearer note.[5] McGladrey participated in this scheme by assisting AmDiv to prepare a financial statement showing $11 million in proceeds from the sale of the bearer note "without ever properly confirming whether such funds actually existed." Later, conducting an "independent audit" of the very financial records it had participated in preparing, McGladrey affirmed the existence of the proceeds from the bearer note.[6] This affirmation by McGladrey was false and known by it to be false because McGladrey had never verified the existence of the bearer note or its proceeds.[7]

McGladrey also assisted AmDiv in preparing and filing other pre-IPO reports with the Securities and Exchange Commission (SEC), which contained materially false information concerning AmDiv's financial strength, the state of the company's development and its ability to execute its business plan.[8]

In November 1998 Nutmeg agreed to provide underwriting services to AmDiv in connection with AmDiv's IPO. Nutmeg entered into this agreement with AmDiv based on the false or misleading financial records and other documents prepared and audited by McGladrey.[9] The false and misleading statements in these documents were material to Nutmeg's decision to

[5]The complaint alleges in relevant part: "Defendants . . . manipulated American Diversified financial information as to so include as an asset in financials for American Diversified for the year end August 1998, the purported proceeds of the sale of the bearer note in an amount in excess of $11 million, even though neither defendants McGladrey & Pullen, Stoll, Jeffers or JWSF had ever properly verified whether the note existed or whether the proceeds had been received by American Diversified." It further alleges: "Defendants McGladrey & Pullen, Stoll, Jeffers and JWSF initially manipulated the year-end dates for American Diversified in order to permit American Diversified to include the proceeds from the bearer note of approximately $11 million on *financial statements* without ever properly confirming whether such funds actually existed." (Italics added.)

[6]It is alleged "[t]he existence of the proceeds from the bearer note was confirmed in audited financial statements . . . submitted to the SEC on or about November 10, 1998. The audit was conducted by defendant McGladrey & Pullen and stated that the financial statements were 'free from material misstatement' and that they presented fairly, 'in all material respects, the financial position of American Diversified . . . as of August 31, 1998 and 1997.' Subsequent filings with the SEC by American Diversified contained the same representations."

[7]The complaint states: "[D]efendants failed to disclose the fact that the bearer note, if it actually existed, was worthless, and the fact that defendants' alleged verification of the existence of the bearer note (and its proceeds) was false."

[8]Nutmeg alleges: "McGladrey & Pullen, Stoll, Jeffers and JWSF assisted Hartmann in filing reports necessary to publicly sell stock in American Diversified, which reports included materially false information concerning the financial strength of American Diversified, the state of the company's development and functionality, and its ability to put into place the business plan developed by Hartmann and his group of investors . . . ."

[9]Nutmeg contends it "entered this agreement based on the information contained in American Diversified's registration statement . . . and other documents filed with the [SEC],

undertake the IPO and were made by McGladrey with the knowledge and intent Nutmeg would rely on them in making its decision. Nutmeg did in fact rely on these false and misleading statements in agreeing to assist in AmDiv's IPO.[10]

While proceeding with the steps necessary for the IPO, Nutmeg raised questions about AmDiv's accounting practices. In response to Nutmeg's concerns, McGladrey assisted AmDiv in the preparation of a letter assuring Nutmeg "the statements set forth in the registration statement [with the SEC] that are not legal in nature are true and correct . . . and that there are no omissions or misrepresentations of any material facts contained therein, nor are there any omissions of fact necessary in order to make the statements made in the registration statement not misleading." These statements were untrue and McGladrey was aware these untrue statements would be communicated to Nutmeg, and intended Nutmeg to rely upon them.[11]

AmDiv subsequently terminated Nutmeg's services and refused to pay the fees due Nutmeg in the sum of approximately $775,000.[12] This action followed against AmDiv, McGladrey and AmDiv's attorneys.[13]

McGladrey demurred to the complaint on the ground Nutmeg's claim is barred under the decision in *Bily* because Nutmeg did not and cannot allege

---

and on the conduct alleged in Paragraph 15 above [(see fn. 5, *ante*)] as well as the representations of defendants detailed below." Those representations included a statement by McGladrey that " '[i]n our opinion, the consolidated financial statements referred to . . . present fairly, in all material respects, the financial position of American Diversified Holdings, Inc. and subsidiaries . . . and the results of their operations and their cash flows for the period indicated in conformity with generally accepted accounting principals.' "

[10]Nutmeg alleges the statements by McGladrey referred to above "were material and made with the intent that Nutmeg rely upon them." It further alleges: "[T]he material misrepresentations and omissions set forth above were made intentionally or negligently, recklessly and without reasonable grounds for believing such statements to be true or in violation of the obligations of truthfulness and candor defendants owed to Nutmeg. Nutmeg did in fact rely upon the representations of defendants and proceeded to act as American Diversified's financial advisor, incurring fees and expenses in the process. The total amount of Nutmeg's damages, as a result of defendant's conduct, will be evidenced at trial, but is currently believed to be in excess of $775,000."

[11]The complaint states: "Defendants were aware that these statements would be communicated to Nutmeg and intended Nutmeg to rely upon them."

[12]Nutmeg claims that in an "effort to prevent Nutmeg from discovering defendants' scheme, and to avoid payment of Nutmeg's fees and expenses, American Diversified purportedly terminated Nutmeg as financial advisor based on the false assertion that Nutmeg induced American Diversified to enter into [the agreement] by misrepresenting its capacity to perform as a managing underwriter. After terminating Nutmeg, American Diversified refused to pay Nutmeg its fees and expenses in acting as financial advisor, and the amounts owed to it under the terms of the [agreement]. Nutmeg is currently owed in excess of $775,000."

[13]AmDiv and its attorneys are not parties to this appeal, which concerns only the demurrer of McGladrey.

it was McGladrey's client, it had any direct contact with McGladrey concerning any of the matters alleged in the complaint, or that it was an intended recipient of McGladrey's audit reports relating to the financial statements of AmDiv.

The trial court sustained McGladrey's demurrer without leave to amend and subsequently entered judgment for McGladrey. Nutmeg filed a timely appeal.

DISCUSSION

### I.  Standard of Review

We note at the outset a well-established rule. When a demurrer to a complaint is sustained without leave to amend the complaint is reviewed de novo to determine whether, liberally construed, it states a cause of action under any conceivable theory, or could be amended to do so.[14] As we shall explain below, the trial court erred in sustaining the demurrer to Nutmeg's complaint for three independent reasons. First, Nutmeg's complaint falls outside *Bily*'s "intended reliance" limitation on liability for independent audits,[15] because it alleges McGladrey was more than an independent auditor. In essence, the complaint alleges McGladrey knowingly assisted AmDiv in preparing false or misleading financial reports and then, in an audit of the reports it had prepared, certified those reports as fairly representing the company's financial position. Second, even under the "intended reliance" rule in *Bily*, we conclude the allegations in the complaint are sufficient to state a cause of action for negligent misrepresentation. Third, the complaint falls outside the "intended reliance" rule because it alleges *intentional* misrepresentation on the part of McGladrey. Intentional misrepresentation is not subject to the "intended reliance" rule applicable to negligent misrepresentation.[16]

### II.  *Bily*'s Limitation on Liability for Negligent Misrepresentation Only Applies to Those Conducting Independent Audits; It Does Not Apply to Those Who Prepared the Underlying Financial Reports

The Supreme Court began its opinion in *Bily* by stating the issue: "We granted review to consider whether and to what extent an accountant's duty

---

[14]See, e.g., *Gursey, Schneider & Co. v. Wasser, Rosenson & Carter* (2001) 90 Cal.App.4th 1367, 1371 [109 Cal.Rptr.2d 678]; and see 5 Witkin, California Procedure (4th ed. 1997) Pleading, section 943, pages 400-402 and cases cited therein.

[15]*Bily, supra,* 3 Cal.4th at pages 375, 376.

[16]*Bily, supra,* 3 Cal.4th at page 415.

of care in the preparation of *an independent audit* of a client's financial statements extends to persons other than the client."[17] The court explained an "audit," for purposes of its opinion " 'is a verification of the financial statements of an entity through an examination of the underlying accounting records and supporting evidence.' . . ."[18] In an audit, " 'an accountant reviews financial statements prepared by a client and issues an opinion stating whether such statements fairly represent the financial status of the audited entity.' . . ."[19] An auditor, the court observed, "is a watchdog, not a bloodhound. . . . As a matter of commercial reality, audits are performed in a client-controlled environment. The client typically prepares its own financial statements; it has direct control over and assumes primary responsibility for their contents. . . . Because the auditor cannot in the time available become an expert in the client's business and record-keeping systems, the client necessarily furnishes the information base for the audit."[20]

Given the limited "secondary" role of the auditor in the financial reporting process,[21] the Supreme Court concluded the auditor's liability to third parties also must be limited. Otherwise, the auditor would be subjected to "multi-billion-dollar professional liability that is distinctly out of proportion to . . . the fault of the auditor . . . and . . . the connection between the auditor's conduct and the third party's injury . . . ."[22] Accordingly, the court held "an auditor's liability for general negligence in the conduct of an audit of its client financial statements is confined to the client."[23] The court further held an auditor's liability to third parties for negligent misrepresentation is confined to those representations " 'made with the intent to induce plaintiff, or a particular class of persons to which plaintiff belongs, to act in reliance

---

[17]*Bily, supra,* 3 Cal.4th at page 375, italics added.

[18]*Bily, supra,* 3 Cal.4th at page 380, citation omitted.

[19]*Bily, supra,* 3 Cal.4th at page 380, citation omitted.

[20]*Bily, supra,* 3 Cal.4th at page 399.

[21]*Bily, supra,* 3 Cal.4th at pages 398, 400.

[22]*Bily, supra,* 3 Cal.4th at page 402. The court discussed two other reasons for limiting liability for negligence in preparing an independent audit. The generally more sophisticated users of audit reports can adjust their risks through contract and "private ordering." (*Id.* at p. 398.) Without limitations, auditor liability would result in "increased expense and decreased availability of auditing services." (*Ibid.*) It is clear from the opinion, however, concern over potential liability far out of proportion to fault was the primary factor which led the court to place restrictions on the duty owed by auditors to third parties. (*Id.* at pp. 399-402.)

[23]*Bily, supra,* 3 Cal.4th at page 406. Nutmeg's complaint does not plead a cause of action for general negligence against McGladrey and we do not address the issue of general negligence in this opinion.

upon the representation in a specific transaction, or a specific type of transaction, that [the auditor] intended to influence.' "[24]

The limitations *Bily* imposed on auditor liability are not applicable to the present case. Here, according to the allegations in the complaint, McGladrey did not simply conduct an independent audit of AmDiv's financial statements. Rather, McGladrey participated in the *creation* of these financial statements.[25]

Specifically, the complaint alleges McGladrey *"manipulated American Diversified financial information* as to include as an asset in financials for American Diversified for the year end August 1998, the purported proceeds of the sale of the bearer note in an amount in excess of $11 million even though neither [McGladrey nor AmDiv's attorneys] had ever properly verified whether the note existed or whether the proceeds had been received by American Diversified." (Italics added.) McGladrey, it is alleged, included the $11 million "as an asset of American Diversified only after demanding the information and documents, and being threatened with losing the opportunity to remain as American Diversified's accountants . . . ." The complaint further alleges McGladrey "assisted [AmDiv] in filing the reports necessary to publicly sell stock in [AmDiv], which reports included materially false information concerning the financial strength of [AmDiv] . . . ."

Taking the allegations of the complaint to be true, as we must,[26] Nutmeg alleges McGladrey participated in the preparation of AmDiv's most significant financial records and then conducted a purported "independent audit" of the records it prepared. Under these circumstances McGladrey is not entitled to the protection from liability to third parties which the Supreme Court, in *Bily*, extended to independent auditors. McGladrey's role was not "secondary," but primary.[27] It did not simply " 'review[] financial statements prepared by a client;' "[28] it prepared the financial statements it reviewed. Indeed, under the facts alleged it would be difficult for McGladrey to claim it conducted an "independent audit" as the Supreme Court used that term in

---

[24]*Bily, supra,* 3 Cal.4th at page 414; and see Restatement Second of Torts, section 552. The Supreme Court rejected the view of some courts and commentators an auditor is liable for negligence to all foreseeable users of the audit report because adopting such a rule would expand auditor liability far out of proportion to fault. (*Bily,* at pp. 389-392; 399-402; 405, fn. 15, disapproving *International Mortgage Co. v. John P. Butler Accountancy Corp.* (1986) 177 Cal.App.3d 806, 820 [223 Cal.Rptr. 218].

[25]See allegations quoted in footnotes 5 and 6, *ante.*

[26]*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].

[27]Cf. *Bily, supra,* 3 Cal.4th at page 399.

[28]*Bily, supra,* 3 Cal.4th at page 380.

*Bily* or to draw a meaningful distinction between McGladrey's "audit" and its preparation of the financial records.[29]

Accordingly, we hold where an "outside" or "independent" accountant prepares as well as audits a corporation's financial records it is liable for negligent misrepresentation to those third parties who reasonably and foreseeably relied on the financial records, the audit, or both.[30] Here, Nutmeg alleged it relied on both the audit and the underlying financial records.[31]

III. *The Allegations in the Complaint Are Sufficient to State a Cause of Action for Negligent Misrepresentation Under the Intended Reliance Rule*

The principal holding in *Bily* is that a third party seeking to recover damages from an independent auditor based on negligent misrepresentations in the audit must plead and prove " '[t]he representation [was] made with the intent to induce plaintiff, or a particular class of persons to which plaintiff belongs, to act in reliance upon the representation in a specific transaction, or a specific type of transaction, that defendant intended to influence.' "[32] Under this "intended reliance" rule, a defendant " 'is deemed to have intended to influence [its client's] transaction with plaintiff whenever defendant knows with substantial certainty that plaintiff, or the particular class of persons to which plaintiff belongs, will rely on the representation in the course of the transaction.' "[33]

■ Nutmeg's complaint alleges McGladrey knew and intended Nutmeg would rely on McGladrey's audit and other statements regarding AmDiv's financial condition in agreeing to act as underwriter for AmDiv's IPO. Nutmeg did in fact rely on the audit and other statements by McGladrey in taking on the AmDiv IPO.

These allegations are sufficient under *Bily* to establish a duty of care to Nutmeg on the part of McGladrey. Indeed, an auditor's liability for negligent misrepresentation does not require proof the audit was intended to influence the particular plaintiff. Rather, a complaint for negligent misrepresentation is sufficient if it alleges the audit was intended to influence " 'the particular

---

[29]See *Bily, supra,* 3 Cal.4th at page 380.

[30]See *Bily, supra,* 3 Cal.4th at pages 389-392; cf. *International Mortgage Co. v. John P. Butler Accountancy Corp, supra,* 177 Cal.App.3d at pages 818-821, disapproved on other grounds in *Bily, supra,* 3 Cal.4th at page 405, footnote 15.

[31]See footnote 10, *ante.*

[32]*Bily, supra,* 3 Cal.4th at page 414.

[33]*Bily, supra,* 3 Cal.4th at page 414.

class of persons to which plaintiff belongs.' "[34] IPO underwriters are a sufficiently "narrow and circumscribed class of persons" for purposes of an auditor's duty of care under *Bily*. Furthermore, McGladrey is a large and experienced accounting firm and it undoubtedly knew one purpose of its audit was to attract a prestigious investment banker to underwrite AmDiv's IPO.[35] McGladrey also could reasonably foresee an underwriter would rely upon the representations in its audit report. Given the complex nature of the audit function,[36] " '[u]nderwriters [are generally] entitled to rely on [the auditor's] expertise.' "[37]

Contrary to McGladrey's argument on appeal, Nutmeg was not required to allege AmDiv instructed McGladrey to prepare an audit report specifically for Nutmeg, or Nutmeg asked McGladrey to conduct an audit on Nutmeg's behalf, or Nutmeg directly asked McGladrey about McGladrey's ability to pay Nutmeg's underwriting fees. All Nutmeg needed to allege was McGladrey knew and intended Nutmeg, or the class of IPO underwriters, to rely on its audit report.[38] Nutmeg's complaint made this allegation.[39]

McGladrey next argues it owed no duty to avoid making negligent misrepresentations to Nutmeg because Nutmeg is precisely the kind of sophisticated consumer identified in *Bily* as being able to protect itself through private ordering. McGladrey draws this argument from the Supreme Court's explanation why an auditor is not liable to third parties for general negligence. The court contrasted the "powerless consumer" in product liability cases to investors, creditors and others who read and rely on audit reports and financial statements and concluded the latter "often possess considerable sophistication in analyzing financial information" and can "privately order" the risk of inaccurate financial reporting by contractual agreements with the client or the client's auditor or commission its own auditor or investigator.[40] The court did not hold or even suggest a plaintiff's ability to engage in private ordering precluded it from recovering for negligent misrepresentation if it fell within the limited class of persons to whom an auditor owed a duty of care, i.e., those persons whom the auditor knew would rely on its representations in transacting business with its client. Rather, the court said

---

[34]*Bily, supra,* 3 Cal.4th at page 414.

[35]See *Bily, supra,* 3 Cal.4th at pages 382-383; Ferris, *supra,* 17 J. Corp. L., at pp. 583-584.

[36]*Bily, supra,* 3 Cal.4th at pages 380-383.

[37]*In re Worlds of Wonder Securities Litigation* (9th Cir. 1994) 35 F.3d 1407, 1421. See also *In re Software Toolworks, Inc. Securities Lit.* (N.D.Cal. 1992) 789 F.Supp. 1489, 1498: "Underwriters may reasonably rely on expertised financial statements."

[38]*Bily, supra,* 3 Cal.4th at page 414.

[39]See footnote 10, *ante.*

[40]*Bily, supra,* 3 Cal.4th at page 403.

no unfairness results to those who are excluded from this limited class because they have other methods of protecting their interests through "private ordering."[41]

Finally, McGladrey contends an auditor owes a duty of care only to such third persons as are "specifically intended beneficiaries of the audit report who are known to the auditor and for whose benefit it renders the audit report."[42] Nutmeg cannot recover for negligent misrepresentation, McGladrey maintains, because the facts pled in the complaint show, as a matter of law, Nutmeg was not the "specifically intended beneficiary" of the audit report nor was the audit report intended to influence Nutmeg's agreement to underwrite AmDiv's IPO. Nutmeg admits in its complaint AmDiv submitted the audit report to the SEC as part of AmDiv's registration requirement under the 1933 Securities Act. The act's purpose is to protect investors, not underwriters.[43] Therefore, McGladrey concludes, the audit report was intended to benefit or influence investors in their decision whether to purchase shares of AmDiv in the IPO, not to benefit or influence an underwriter such as Nutmeg in its decision whether to underwrite AmDiv's IPO.

McGladrey reads *Bily* too narrowly. It assumes an audit report only can have one intended beneficiary and only can influence one type of transaction. We find nothing in *Bily* to support these assumptions.

As previously noted, the Supreme Court's principal concerns in *Bily* were to " 'avoid limitless liability out of all proportion to the degree of [the auditor's] negligence' " while holding the auditor liable "in situations where it clearly intended to undertake the responsibility of influencing particular business transactions involving third persons."[44] To address these concerns, the court adopted the "intended reliance" rule from the Restatement Second of Torts. In the court's view, the advantage of the Restatement rule over a rule of general foreseeability is that the Restatement rule gives the commercial supplier of information, e.g., an auditor, information "as to the nature and scope of the client's transactions that may expand the supplier's exposure liability."[45] This information is critically important, the court said, " 'because the risk of liability to which the supplier subjects himself by undertaking to give the information . . . is vitally affected by the number and character of the persons, and particularly the nature and the extent of the

---

[41]*Bily, supra,* 3 Cal.4th at page 409.

[42]*Bily, supra,* 3 Cal.4th at page 407.

[43]*Frost & Co. v. Mines Corp.* (1941) 312 U.S. 38, 40 [61 S.Ct. 414, 415-416, 85 L.Ed. 500]; *Eichenholtz v. Brennan* (3d Cir. 1995) 52 F.3d 478, 483.

[44]*Bily, supra,* 3 Cal.4th at pages 398, 408; and see footnote 13, *ante,* at page 1440.

[45]*Bily, supra,* 3 Cal.4th at pages 392-393.

proposed transaction.' "[46] If, for example, the client informs the auditor the audit will be used to obtain a bank loan the auditor may be held liable to the lending bank even though the client did not name that specific bank to the auditor and may have submitted the audit to numerous banks in negotiating for a loan.[47] If, on the other hand, an accounting firm customarily performs an annual audit of a corporation for no particular purpose but knows the corporation may employ the audit for a wide variety of aims and the audit may be relied upon by a wide variety of persons, the auditor is not liable to a bank which relies on the audit to make a loan to the corporation.[48]

Thus, under the Restatement rule, as interpreted in *Bily*, liability for an auditor's negligent misrepresentation in an audit report is limited to "those situations in which the supplier undertakes to supply information to a third party whom [it] knows is likely to rely on it in a transaction that has sufficiently specific economic parameters to permit the supplier to assess the risk of moving forward."[49] Under this test for liability it is immaterial how many classes of persons will be exposed to the audit and how many classes of transactions will be influenced by it, *so long as* these classes have "sufficiently specific parameters" to allow the auditor to assess the scope of its liability when it undertakes the audit and thus engage in its own "private ordering" to manage the risk.

In the present case, the complaint alleges McGladrey knew it was preparing financial statements and an audit to be used in connection with an IPO and knew Nutmeg would be relying on these documents in determining whether to act as underwriter for the offering. *Bily* does not require Nutmeg to allege AmDiv told McGladrey the name of the underwriter who would be relying on its reports or allege AmDiv specifically told McGladrey an underwriter would be involved in the IPO. *Bily* only requires McGladrey knew "with substantial certainty" Nutmeg or the particular class of persons to which Nutmeg belongs, i.e., underwriters, would rely on the reports in the course of preparing the IPO.[50] As previously noted, it can be inferred McGladrey knew there would be an underwriter for the IPO based on the customary manner in which IPO's are generated and McGladrey's experience as a public accounting firm. The fact McGladrey knew the SEC would

[46]*Bily, supra*, 3 Cal.4th at page 393, italics omitted, quoting from Restatement Second of Torts, section 552, comment (h), page 133.

[47]*Bily, supra*, 3 Cal.4th at page 393; and see Restatement Second of Torts, section 552, comment (h), page 134.

[48]*Bily, supra*, 3 Cal.4th at pages 393-394; Restatement Second of Torts, section 552, comment (h), page 135.

[49]*Bily, supra*, 3 Cal.4th at page 409.

[50]*Bily, supra*, 3 Cal.4th at page 414.

also rely on the audit report in deciding whether to authorize the IPO does not cancel out McGladrey's liability to Nutmeg.

## IV. *The Complaint Alleges a Cause of Action for Intentional Misrepresentation*

The Supreme Court, in *Bily*, recognized even an independent auditor is not shielded by the "intended reliance" rule in cases of intentional misrepresentation.[51] "[T]he liability of auditors to third parties presents different policy considerations when intentional fraud is involved. . . . By joining with its client in an intentional deceit, the auditor thrusts itself into a primary and nefarious role in the transaction."[52] Thus, the court held, an independent auditor is subject to liability for representations " 'made with the intent to defraud plaintiff, or a particular class of persons to which the plaintiff belongs, whom defendant intended *or reasonably should have fore-seen* would rely upon the representation.' "[53]

A complaint for intentional misrepresentation may allege either "the auditor's actual knowledge of the false or baseless character of its opinion" or the auditor had " 'no belief in the truth of the statement, and [made] it recklessly, without knowing whether it is true or false . . . .' "[54] Nutmeg's complaint alleges both actual knowledge of falsity and reckless disregard for the truth.

The complaint alleges McGladrey prepared an audit report for submission as part of AmDiv's required registration statement with the SEC in which McGladrey stated it had "audited the balance sheets of American Diversified and its subsidiaries [and] 'in our opinion, the consolidated financial state-ments referred to . . . present fairly, in all material respects, the financial position of American Diversified . . . and the results of their operations and their cash flows for the period indicated in conformity with generally accepted accounting principles.' " This statement was false.[55] The audit and the underlying financial reports contained numerous material misstatements and did not fairly represent the financial position of AmDiv. Among other things, McGladrey confirmed AmDiv's assets included $11 million from the

[51]*Bily*, *supra*, 3 Cal.4th at page 415.
[52]*Bily*, *supra*, 3 Cal.4th at page 415. The public policy reasons for a broader standard of liability in cases of intentional misrepresentation are also discussed in Restatement Second of Torts, section 552, comment (a), pages 127-128.
[53]*Bily*, *supra*, 3 Cal.4th at page 415, italics added.
[54]*Bily, supra*, 3 Cal.4th at page 415, citation omitted.
[55]The fact McGladrey termed its report an "opinion" does not insulate it from liability for negligent or intentional misrepresentation. *Bily*, *supra*, 3 Cal.4th at page 408.

proceeds of the sale of a bearer note without ever verifying whether such a bearer note existed or whether AmDiv had actually received the proceeds. "[A]t all relevant times," the complaint alleges, McGladrey was "aware that American Diversified had no real value or functionality as a company, that any stock of American Diversified would be essentially worthless, and that an American Diversified IPO could not take place legitimately."

Nutmeg further alleges "the material misrepresentations and omissions set forth [in the complaint] were made intentionally . . . recklessly and without reasonable grounds for believing such statements to be true . . . ." In support of this allegation, Nutmeg alleges McGladrey, in return for "the promise of substantial future business" from AmDiv, agreed "to ignore [its] professional obligations" and, "without any reasonable basis for doing so, confirmed that the proceeds from the bearer note of approximately $11 million had been correctly stated by . . . American Diversified, and that investors and others could have confidence that this asset could and would be available to capitalize the business activities of American Diversified." McGladrey also intentionally "manipulated American Diversified financial information [to] include as an asset in financials for American Diversified . . . the purported proceeds of the bearer note in an amount in excess of $11 million . . . ." McGladrey did so, not in the exercise of its professional responsibilities, but after "being threatened with losing the opportunity to remain as American Diversified's accountants . . . ."

The complaint alleges McGladrey's false and misleading statements were "made with the intent that Nutmeg rely upon them" and "Nutmeg did in fact rely upon the representations of [McGladrey] and proceeded to act as American Diversified's financial advisor, incurring fees and expenses in the process."

After Nutmeg agreed to act as underwriter for AmDiv's IPO it raised questions regarding some of AmDiv's accounting practices. In response to these inquiries and "to thwart the discovery of their scheme and misrepresentations" defendants, including McGladrey, "assisted American Diversified in preparing a modification to its contract with Nutmeg . . . which represented and warranted that 'the statements set forth in the registration statement [filed with the SEC] that are not legal in nature are true and correct . . . .' "

The complaint alleges a cause of action for intentional misrepresentation. McGladrey represented AmDiv's financial statements were prepared "in conformity with generally accepted accounting principles" and confirmed

the existence of $11 million in assets representing the proceeds from the sale of a bearer note. The first statement was false because McGladrey did not follow generally accepted accounting principles in confirming the existence of the $11 million. As a result the second statement could not have been made with a good faith belief in its truth but rather was made recklessly without knowing whether it was true or false.[56] It is alleged McGladrey made the representations with the specific intent to defraud Nutmeg and Nutmeg relied on those representations.

## DISPOSITION

The judgment is reversed. Appellant is awarded its costs on appeal.

Lillie, P. J., and Boland, J., concurred

A petition for a rehearing was denied November 20, 2001, and respondent's petition for review by the Supreme Court was denied January 16, 2002. Werdegar, J., did not participate therein.

---

[56]See *Bily, supra,* 3 Cal.4th at page 415.