55 Cal.Rptr.3d 777 (2007)
148 Cal.App.4th 460
Paul KOURI et al., Petitioners,
v.
SUPERIOR COURT OF the STATE of California for the COUNTY OF LOS ANGELES, Respondent.
BDO Seidman, LLP, Real Party in Interest.
No. B189876.
Court of Appeal of California, Second District, Division Eight.
March 8, 2007.
*778 Law Offices of Randall David Smith, Randall David Smith; Law Offices of John N. Frye and John N. Frye, for Petitioners.
No appearance for Respondent.
White & Case, Travers D. Wood, Matthew P. Lewis and Mark E. Gustafson for Real Party in Interest.
RUBIN, J.

FACTS AND PROCEDURAL HISTORY
Wincom was a privately held start-up wireless telecommunications company hoping to develop an interactive television business. Under its business plan, Wincom intended to execute a reverse merger with Struthers Industries, Inc., a publicly traded company. The two companies envisioned Wincom emerging from the merger in control of the new entity, which would be a publicly tradeable company.
BDO Seidman is a national accounting firm. In preparation for the merger, Wincom hired BDO in January 1996 to audit its balance sheet and financial statements for the year ending on December 31, 1995. Three months later in April 1996, BDO delivered an audit report to Wincom certifying its 1995 financial statements and balance sheet complied with generally accepted accounting principles.[1] The report approved Wincom's balance sheet showing $121 million in assets, the lion's share consisting of $79 million in broadcasting licenses and $28 million in real estate. Wincom had vastly inflated its financial worthiness and wealth when judged by generally accepted accounting principles, however, because its ownership of the real estate and licenses was contingent on the pending merger, but accounting principles prohibited including contingent assets on a company's balance sheet. BDO claims it told Wincom not to give the audit report to anyone other than people working on the merger. Regardless of what BDO says it told Wincom, however, petitioners assert BDO knew Wincom planned to distribute the report to others, including investors such as petitioners. After repeated delays, the merger was finally completed in September 1996, but Wincom's interactive television business failed to get off the ground and in 1998 it filed for bankruptcy.
A number of Wincom investors sued BDO and a second accounting firm which is not a party to these proceedings. They alleged BDO's audit report intentionally or negligently let Wincom overstate its assets. They also alleged they relied on the report in deciding to invest in Wincom. Finally, they alleged they lost their investments when the merged company went bankrupt, and Wincom's assets were revealed as grossly inflated. (Murphy v. *779 BDO Seidman (2003) 113 Cal.App.4th 687, 6 Cal.Rptr.3d 770 (Murphy) [discusses early stages of the investors' lawsuit against BDO].)
BDO demurred to the complaint on multiple grounds. One ground was BDO had no duty to the investors. A second ground was investors who held onto their stock, instead of buying or selling it, could not prove they detrimentally relied on the audit report. The court sustained the demurrer and dismissed the complaint.
The investors appealed, and in a published decision we reversed and remanded as to almost all the investors. We held BDO could be liable under certain circumstances to the investors for negligent and intentional misrepresentations in its audit report. (Murphy, supra, 113 Cal.App.4th at pp. 694-695, 6 Cal.Rptr.3d 770.) We also held that investors who relied on the report in deciding not to sell their stock  so-called "holding investors"  could state a cause of action under the Supreme Court's then-recent decision in Small v. Fritz Companies, Inc. (2003) 30 Cal.4th 167,132 Cal.Rptr.2d 490, 65 P.3d 1255 (Small). (Murphy, at pp. 701-702, 6 Cal.Rptr.3d 770.) We therefore remanded the action to permit the investors to amend their complaint to conform to Small, and to let them pursue their causes of action for negligent and intentional misrepresentations.
BDO thereafter moved in January 2006 for summary judgment or adjudication of the negligent and intentional misrepresentation claims by two families among the investors: Petitioners Paul, Bobbie, Joseph, Kimla, Robert, and John Kouri, and petitioners Louis and Norma Penner. As this lawsuit is not a class action, we note that the Kouris and Penners are not class representatives, but the trial court and parties appear to have treated them as test plaintiffs for the other investors.
The court granted summary adjudication for BDO on the intentional misrepresentation claim.[2] It found petitioners had no evidence that BDO knew when it issued its certified audit report that the representations in Wincom's financial statements and balance sheet were false. The court dismissed as speculative the opinion of petitioners' accounting expert, Barry Epstein, that Wincom's and BDO's mistakes and misrepresentations were too egregious for any accountant, including BDO, to have innocently committed or overlooked. The massiveness of Wincom's fraud was not, the court found, evidence that BDO knew about it. (Anderson v. Deloitte & Touche (1997) 56 Cal.App.4th 1468, 1475-1476, 66 Cal.Rptr.2d 512 (Anderson).)
The court also granted summary adjudication for BDO on the negligent misrepresentation claim by the Penners (but not the Kouris). The court found the Penners could not prove they relied on Wincom's and BDO's misrepresentations because they bought their stock in July 1995, almost one year before they saw BDO's audit report in June 1996. Moreover, the court noted, the Penners had tried to sell 80 percent of their shares the day they bought them, barring at least as to those shares a claim that they held onto their stock in reliance on the misrepresentations.[3] And finally, for the remaining 20 percent, the Penners' assertion that they *780 would have tried to rescind their investment in Wincom if they had known about the misrepresentations did not satisfy Small's heightened pleading requirement that holding-investors allege not just the number and timing of the shares they would have sold, but that, as the court understood Small, they also show specific acts they took beyond unspoken thoughts and decisions.
Petitioners sought a writ of mandate in this court ordering the trial court to reverse its orders granting BDO summary adjudication. We issued an alternative writ of mandate directing the trial court to reverse its orders, or alternatively show cause why it should not do so. As the trial court did not comply with our writ, we set the matter for briefing and oral argument.[4]

DISCUSSION

1. Triable Issue of BDO's Intent to Defraud

The court found petitioners had no evidence that BDO intentionally defrauded them. Petitioners contend the court erred because they did not need to prove BDO knew Wincom's representations were false; petitioners could prove fraud, they argued, by showing BDO issued its audit report recklessly, meaning it had no belief in the truth of Wincom's financial statements and balance sheet and certified them without knowing whether they were true or false. As one court explained, an investor suing an auditor for "intentional misrepresentation may allege either the auditor's actual knowledge of the false or baseless character of its opinion' or the auditor had `"no belief in the truth of the statement, and [made] it recklessly, without knowing whether it is true or false. . . ."'" (Nutmeg Securities, Ltd. v. McGladrey & Pullen (2001) 92 Cal. App.4th 1435, 1448, 112 Cal.Rptr.2d 657; see also Bily v. Arthur Young & Co. (1992) 3 Cal.4th 370, 415, 11 Cal.Rptr.2d 51, 834 P.2d 745; Murphy, supra, 113 Cal.App.4th at p. 696, 6 Cal.Rptr.3d 770; cf. Friedman v. Merck & Co. (2003) 107 Cal. App.4th 454, 475-476, 131 Cal.Rptr.2d 885 [statement made merely "without reasonable ground for believing" its truth is only negligent misrepresentation].)
In support of their allegation that BDO was reckless with the truth, petitioners cite the declaration of their accounting expert, Barry Epstein. The thrust of Epstein's *781 declaration is that BDO's deviation from generally accepted accounting principles (GAAP) and other professional standards in approving Wincom's financial statements and balance sheet was so egregious that it could not have been accidental. The unavoidable inference, according to Epstein, was BDO recklessly, if not intentionally, furthered Wincom's fraud by certifying Wincom's financial documents.
To prove BDO's recklessness (if not outright fraud), petitioners rely most prominently on a letter to the Securities and Exchange Commission from Bradley Schrupp, BDO's engagement partner, who oversaw the audit report. In his January 1996 letter, Schrupp asked the commission's consent to BDO's valuing Wincom's contingent assets (broadcast licenses and real estate) "on their estimated fair value" when the contingencies were removed, instead of their "predecessor cost." Petitioners assert BDO's inquiry intentionally misled the SEC because BDO had already approved Wincom's placement of those assets on Wincom's balance sheet and financial statements even though the contingencies were still in place and remained so until the merger's completion in September 1996, a clear violation, according to Epstein, of GAPP. Deepening, according to Epstein, BDO's misdirection of the SEC, Schrupp's letter told the SEC that BDO intended, when the merger was completed, to use those assets' appraised value as a proxy for their fair value, again completely ignoring that BDO had already approved the placement of those assets on Wincom's balance sheet. The letter stated, "WIN intends to record the acquisition of the DTDS licenses and the real estate at the time the contingencies discussed above are removed. WIN intends to record these transactions at the estimated fair market/appraised values of those assets at the dates of acquisition. WIN management does not expect there to be any significant changes in the value of the assets between the dates the contracts were signed and the expected consummation date of the transaction."
Despite Schrupp's reassuring promises to the SEC, BDO admitted doing exactly the opposite by not waiting to put the assets on Wincom's books. As BDO later admitted to the SEC:
"[T]he purchase agreement for the IVDS licenses and for some of the real estate contained certain contingent language. The sellers of the IVDS Broadcast licenses and the real estate acquired by WINCOM had the contractual right to rescind the transaction, should the Struthers transaction [i.e., the merger] not close. The Stock and the various assets purchased for the stock could be returned to the original owner. Management of WINCOM believed at the time of the purchase that the likelihood of closing the Struthers transaction was probable. As part of our year end audit procedures we analyzed the contingent nature of these agreements and we also obtained an understanding of the proposed merger with Struthers. Based on the proposed merger and the fact that a small group of shareholders controlled Struthers and the ability to approve the merger it was our opinion that the merger was probable and therefore the contingency was remote. . . . Based on these facts management of WINCOM recorded the transactions as asset purchases and we concurred." [Emphasis added.]
The SEC replied to Schrupp's letter in February 1996 unaware that Wincom had already placed the licenses and real estate on its balance sheet. The commission agreed that upon the merger's completion Wincom should book the assets at their fair value. The commission rejected, however, *782 Schrupp's request to use the assets' acquisition value as their fair value. The commission instead told Schrupp the fair value would be the cash the assets would fetch if sold on the open market.
BDO's correspondence with the SEC is a window into BDO's alleged recklessness (if not outright assistance) in furthering Wincom's defrauding of its investors. Wincom told its investors it owned more than $120 million in assets, but $107 million of that was contingent assets Wincom could not rightfully place on its balance sheet. Furthermore, not only should Wincom not have placed the assets on its balance sheet, but the value it assigned to them was dubious. For example, Wincom valued the broadcast licenses as worth $83 million, but a few months earlier the licenses' owner had paid only $21 million for them. BDO's certification of Wincom's financial documents inflated Wincom into a substantial company, when in fact it was a shadow of itself under generally accepted accounting principles.
BDO denies it tried to deceive the SEC and, by implication, anyone else. In support, it cites a letter from the SEC to Struthers discussing Struthers' proxy materials for its merger with Wincom. In that letter, the SEC asked Struthers to "please provide for each type of asset . . . the source/method for valuation of the asset to be acquired and the basis for determining the fair value of the preferred stock to be issued in acquisition thereof." According to BDO, this letter demonstrates Struthers, and by extension its merger partner Wincom, were discussing the value of Wincom's assets with the SEC. This discussion, according to BDO, belied petitioners' contention that BDO was misdirecting the SEC about its certification of Wincom's balance sheet and financial statements.
BDO's claim is unavailing because the letter adds to the constellation of disputed facts and inferences in this lawsuit, but the swirl of such facts and inferences cannot support summary adjudication against petitioners' fraud claims. Indeed, elsewhere in the letter, the SEC emphasized the impropriety of putting contingent assets on a balance sheet. The SEC wrote, "the report indicates that asset acquisitions reflected in the financial statements are contingent upon closing of the sales transaction. Under those circumstances, the related assets and liabilities reflected in the financial statements are only contingencies until closing of the Struthers transaction. The staff refers to paragraphs 26 and 47 of FASB Concepts Statement 5. Please . . . advise the staff how the asset acquisitions meet the requirements therein for recognition as assets, or revise the financial statements accordingly."
The trial court appears to have concluded that BDO's deviation from generally accepted accounting principles did not, by itself, show fraudulent intent by BDO. The court criticized petitioners' accounting expert Epstein for what it considered his speculation about BDO's intent based on its approval of Wincom's financial documents. The court was correct in noting that "mere speculation" or "bare assertion" do not create a triable issue that defeats summary adjudication. (Sangster v. Paetkau (1998) 68 Cal.App.4th 151, 163, 80 Cal.Rptr.2d 66.) But Epstein's opinion was more than mere speculation. He instead explained how inferences could be drawn from what he considered BDO's egregious violations of professional accounting standards.
Case law establishes that blatant deviations from generally accepted accounting principles support an inference of an accountant's recklessness when those *783 deviations are tantamount to "red flags." One court's discussion of an accounting firm's decision to turn a blind eye to accounting irregularities is illustrative. In In re Oxford Health Plans, Inc. (S.D.N.Y. 1999) 51 F.Supp.2d 290 (Oxford), the court stated "Plaintiffs do not allege facts showing that [the accountants] knowingly participated in the alleged fraud by creating or advising Oxford to create false financial statements, or that [the accountants] intended [their] own audit procedures to be insufficient in order to perpetrate the fraud. Rather, plaintiffs allege In your face facts,' . . . that cry out, `how could [the accountants] not have known that the financial statements were false.' Essentially, plaintiffs are alleging that [the accountants] recklessly disregarded, or outright ignored, blatant evidence of Oxford's extreme accounting irregularities " (Oxford, at p. 294; see also In re Leslie Fay Companies, Inc. (S.D.N.Y.1995) 871 F.Supp. 686, 699 [accountant  also BDO  furthers fraud if it ignores "red flags" that any auditor would have noticed].)[5] As a federal circuit court of appeals explained, "common sense and logic dictate that the greater the magnitude of a . . . violation of GAAP, the more likely it is that such a . . . violation was made consciously or recklessly. This, of course, is a matter of degree, but it' cannot be gainsaid that some violations of GAAP . . . are so significant that they, at the very least, support the inference that conscious fraud or recklessness as to the danger of misleading the investing public was present." (PR Diamonds, Inc. v. Chandler (6th Cir.2004) 364 F.3d 671,685.)
BDO asserts that even "extreme deviation" from professional accounting standards is not evidence of fraud. In support, it cites Anderson v. Deloitte & Touche, supra, 56 Cal.App.4th 1468, 66 Cal.Rptr.2d 512. In that case, the appellate court explained that investors' allegations that an accountant's certification of a client's financial forecasts rested on "`extreme deviation' "from accepted forecasting standards did not establish the accountant's intent to defraud. (Id. at pp. 1475-1476, 66 Cal. Rptr.2d 512.) A close reading of Anderson shows, however, that the investors foundered on their inflated litigation rhetoric. The investors tried to pull proof of fraud from their accounting expert's comment that the accountant's deviation from accepted standards was "extreme." But the investors' rhetoric ignored their expert's failure to opine that the accountant knew the forecasts to be false. The court noted, the expert's "declaration does not state that respondent made this misrepresentation knowing it was not true, or that respondent did not believe the representation to be true. As we understand their argument, appellants claim that Fisher's opinion regarding respondent's `extreme deviation' from AICPA standards raises a question that respondent made representations about forecasts without first checking the facts upon which its representations were based, i.e., that it didn't do its homework. This constitutes a claim of negligent misrepresentation rather than an intent to deceive, which is the basis of actual fraud." (Ibid.)

2. Triable Issue of Penners' Reliance

In July 1995, the Penners invested in Wincom. In return for almost 18,000 shares of Wincom stock, they gave Wincom real estate worth $299,000. The day the Penners received their stock, they entered *784 into a contract to sell 80 percent of it to Energex, a company owned by Wincom official Doug Phanco. The Penners never delivered any shares to Energex, however, because Phanco failed to make any of the quarterly payments promised toward the purchase price. Over the next year, the Penners concluded Wincom's financial condition was deteriorating, marked principally by Wincom's continuous delay in completing its merger with Struthers. Not until June 1996, however, did the Penners review BDO's audit report for Wincom's 1995 financial statement. Comforted by more than $100 million in assets on the financial statement, they decided to keep their stock for then.
After it became apparent in the following months that Energex was not going to pay for any of the stock, the Penners entered into a new agreement in September 1996 to sell 80 percent of their shares to Branch Investment Group, LLC, a company run by Fletcher Anderson, a gentleman the Penners had met through Wincom. Branch paid the Penners $2,500 immediately and promised to pay the balance of more than $236,000 within 90 days of completion of the Wincom-Struthers merger. The Penners never received their money.
The court found the Penners could not state a claim for negligent misrepresentation because they had not relied on BDO's audit report in buying, and then immediately trying to sell, their Wincom stock. The Penners contend, on the other hand, that by the second time they tried to sell their stock, they had seen the audit report and were relying on it in pursuing the sale instead of hiring an attorney to rescind their stock purchase and recover their real estate from Wincom. (Murphy, supra, 113 Cal.App.4th at p. 702, fn. 8, 6 Cal. Rptr.3d 770 [reliance includes investor's forbearance in not exercising right of rescission].) Furthermore, the Penners contend they additionally relied on the audit report in deciding to hold onto the 20 percent of the stock they never tried to sell. (Small, supra, 30 Cal.4th at p. 171, 132 Cal.Rptr.2d 490, 65 P.3d 1255 [holding stock may constitute reliance]; Murphy [same].)
The court found that because the Penners first tried to sell their stock before seeing the audit report, they could not claim their second attempted sale rested on the report because their desire to sell was ongoing. The court further found the Penners needed affirmative conduct, not just forbearance from particular acts, to prove they relied on the report. Citing Small, the court found the Penners could not demonstrate reliance in their not rescinding the entire purchase from Wincom, or in not trying to sell the remaining 20 percent they continued to hold. According to the court, the Penners needed to show actual acts taken, not merely things they would have done if they had known about the audit report's misrepresentations.
BDO contends the court correctly applied Small to the Penners. In support, they rely on Justice Baxter's concurrence in Small In his concurrence, Justice Baxter stated a conjunctive test to show an investor relied on an accountant's misstatements to hold onto stock. (Small, supra, 30 Cal.4th at p. 193, fn. 1, 132 Cal.Rptr.2d 490, 65 P.3d 1255 (cone. opn. of Baxter, J.).) Justice Baxter wrote that an investor must allege how many shares he would have sold and when he would have sold them and, instead of merely unspoken thoughts and decisions, must show actions he took in reliance on the misstatements.
We conclude the trial court misapplied Small The majority opinion states what the law is. A concurrence may help explain a majority opinion, but a litigant *785 may not rely on a concurrence to change or contradict that opinion. BDO's focus on Justice Baxter's observation that an investor must show more than unspoken thoughts and decisions takes the Small majority's test for reliance out of context.
The passage from the majority opinion which Justice Baxter cited was the following:
"In the trial court and the Court of Appeal, defendants claimed that plaintiffs assertion of having relied on defendants' misrepresentations was insufficient. We agree that in view of the danger of nonmeritorious suits, such conclusory language does not Satisfy the specificity requirement. In a holder's action a plaintiff must allege specific reliance on the defendants' representations: for example, that if the plaintiff had read a truthful account of the corporation's financial status the plaintiff would have sold the stock, how many shares the plaintiff would have sold, and when the sale would have taken place. The plaintiff must allege actions, as distinguished from unspoken and unrecorded thoughts and decisions that would indicate that the plaintiff actually relied on the misrepresentations." (Small, supra, 30 Cal.4th at p. 184,132 Cal.Rptr.2d 490, 65 P.3d 1255.)
Reading the entire passage in context reveals that Small's requirement to allege action instead of unspoken thoughts and decisions is a broad recapitulation of the sentence immediately preceding it. That preceding sentence  the amount and timing of a stock sale  is merely one example of the type of action the investor could allege he would have taken. The requirement to allege action taken is not an additional element on top of the investor's allegation of how many shares he would have sold and when. Decisions interpreting Small have so held. In Murphy, for example, we stated that "the Small court announced that plaintiffs who rely on a forbearance theory must plead how many shares they would have sold and when they would have sold them." (Murphy, supra, 113 Cal.App.4th at p. 702, 6 Cal. Rptr.3d 770). And the federal district court in Rogers v. Cisco Systems, Inc. (N.D.Fla.2003) 268 F.Supp.2d 1305, relied on Small to establish it was sufficient for an investor to plead "how many shares they would have sold and when they would have sold them." (Id. at p. 1314; see also In re WorldCom, Inc. Securities Litigation (S.D.N.Y.2004) 336 F.Supp.2d 310, 320-321.)
The trial court's interpretation of Justice Baxter's observation puts a gloss on Small that the majority opinion does not support. The majority opinion did not impose a conjunctive test requiring allegations about both the timing and amount of a sale as well as actual actions taken. Indeed the separate concurrence by Justice Kennard, the author of the majority opinion, does not state a conjunctive test. Explaining the majority opinion, she wrote, "persons have a valid cause of action for fraud . . . [if they] `allege specific reliance on the defendant's representations: for example, that if the plaintiff had read a truthful account of the corporation's financial status the plaintiff would have sold the stock, how many shares the plaintiff would have sold, and when the sale would have taken place.'" (Small, supra, 30 Cal.4th at p. 192, 132 Cal.Rptr.2d 490, 65 P.3d 1255 (cone. opn. of Kennard, J.).)

DISPOSITION
The record establishes that BDO's purported fraudulent intent is a triable issue. It also establishes that the Penners' reliance on the audit report is a triable issue. Accordingly, the trial court erred in granting summary adjudication of the Penners' *786 and Kouri's cause of action for intentional misrepresentation, and in granting summary judgment against the Penners. Therefore, let a writ issue directing the trial court to vacate its judgment dismissing the Penner plaintiffs, and its order dismissing the Penner and Kouri plaintiffs cause of action for intentional misrepresentation. Petitioner to recover costs.
WE CONCUR: COOPER, P.J., and BOLAND, J.
NOTES
[1] In following months, BDO also reviewed (as opposed to audited) Wincom's next three quarterly financial statements.
[2] The complaint contained separate causes of action for intentional misrepresentation and for fraud, but the court and counsel agreed to treat the two claims as a single cause of action for intentional misrepresentation.
[3] When this first attempted sale collapsed because the purchaser did not make any payments, the Penners tried again to sell 80 percent of their stock to a new buyer in September 1996, by which time they had seen BDO's audit report.
[4] After this court took this matter under submission following oral argument, the parties informed us that almost all plaintiffs settled with BDO. Because petitioners are among the settling plaintiffs, BDO has moved for dismissal of the petition for writ of mandamus as moot. We decline to dismiss the petition, however, for two reasons.

1. According to the parties, three plaintiffs  none of which are petitioners  have not settled with BDO: Vaco Jarrett & Associates, Vernon Pudwill Company, and Wireless Ventures Preferred Investors. At the hearing on BDO's motion for summary adjudication, the trial court stated that if this court were to affirm its rulings at issue in this writ proceeding, the trial court intended to apply those rulings against all remaining plaintiffs. Were the trial court to do so and thereby dismiss some, or all, of the claims of some, or all, of the non-settling plaintiffs, those plaintiffs would likely seek relief from us on the same grounds urged by petitioners in this writ proceeding. A second petition raising the same issues ably briefed and argued by BDO and petitioners in this proceedings would waste judicial resources. Thus, in the interest of judicial efficiency, we choose not to dismiss the petition.
2. Even if the petitioners' settlement and dismissal of their claims against BDO made the issues involved in this writ proceeding moot, those issues concern matters of accountant liability, an area of continuing public importance. That factor warrants our not dismissing the petition. (9 Witkin, Cal. Proc. (4th ed. 1997) Appeals, § 652.)
[5] Several other cases suggest accountants ignore red flags at their peril. See In re Health Management, Inc. Securities Lit. (E;D.N;Y. 1997) 970 F.Supp. 192, 203; CMNY Capital, L.P. v. Deloitte & Touche (S.D.N.Y.1993) 821 F.Supp. 152, 165; Ades v. Deloitte & Touche (S.D.N.Y.1992) 799 F.Supp. 1493, 1501.