[No. B154584. Second Dist., Div. Eight. Nov. 24, 2003.]

MICHAEL MURPHY et al., Plaintiffs and Appellants, v.
BDO SEIDMAN, LLP, et al., Defendants and Respondents.

■■■■■■■■■■■■■■

Counsel

Law Offices of Gary A. Schlessinger, Gary A. Schlessinger; Law Offices of David E. Wheeler and David E. Wheeler for Plaintiffs and Appellants.

White & Case, Travers D. Wood, Matthew P. Lewis and Mark E. Gustafson for Defendants and Respondents BDO Seidman.

Garrett & Tully, Stephen J. Tully and Christopher G. Piety for Defendant and Respondent Logan, Throop & Company.

Opinion

**RUBIN, J.—**

### INTRODUCTION

Appellant Michael Murphy and literally scores of others appeal from the trial court's judgment dismissing their corrected fifth amended complaint for

failing to state a cause of action. Although the complaint is long, with numerous allegations, dozens of paragraphs, and more than 100 plaintiffs, the gist of the complaint is the following: Accountants BDO Seidman, LLP, and Logan, Throop & Company intentionally or negligently overstated their client's assets in financial statements they prepared. Appellants relied on those financial statements when they invested in the accountants' client and in another company in the process of merging with the client, and relied on those statements in approving the merger. Appellants lost their investments when the merged company went bankrupt, and the company's assets were revealed as grossly overstated. Because the foregoing tells, if true, a story of accounting misfeasance, with few exceptions the court erred in dismissing the complaint at the pleading stage. Accordingly, we affirm in part, reverse in part, and remand.

### FACTUAL AND PROCEDURAL BACKGROUND

Because this is an appeal from a sustained demurrer, we rely on the facts alleged in appellants' complaint without judging their veracity. In November 1995, respondent accounting firm Logan, Throop & Company (Logan) prepared a financial statement for World Interactive Networks, Inc. (WIN), a non-publicly-traded corporation, for the period ending in August 1995. The statement misrepresented the value of various WIN assets, claiming they were worth $145 million when in fact they amounted to only $30 million. Logan also claimed the financial statement complied with generally accepted accounting principles (GAAP) when it did not. In February 1996, Logan repeated essentially the same misrepresentations in its auditors' report of WIN's 1995 balance sheet.

The same month that Logan released its auditors' report, respondent accounting firm BDO Seidman, LLP (Seidman), issued WIN's audited financial statement for 1995. In the statement, Seidman misrepresented the value of WIN's assets, claiming they were worth slightly more than $121 million, when they were truly worth only $6.9 million. In addition, Seidman misrepresented WIN's shareholder equity as $88 million, when the company was worthless. Several months later, Seidman repeated essentially the same misrepresentations when it released its review of WIN's quarterly balance sheet for the period ending March 1996.

Struthers Industries, Inc. (Struthers), was a publicly traded corporation. In 1995, WIN and Struthers agreed to a reverse merger, subject to shareholder approval, in which WIN would sell its assets to Struthers in return for Struthers stock, following which Struthers would become WIN's subsidiary. While the proposed merger was pending, Seidman prepared a pro forma financial statement of Struthers and WIN as a combined entity, which

substantially repeated, from Seidman's earlier audit of WIN, the same false asset values and misrepresentations about complying with GAAP. In January 1997, Seidman sent the pro forma statement to the Securities and Exchange Commission. The SEC told Struthers the pro forma statement did not comply with GAAP because it did not properly account for the inherent uncertainty of the proposed merger. Seidman did not tell appellants, all of whom either owned or later bought WIN or Struthers stock, about the SEC's rejection of Seidman's accounting for the proposed merger.

In March 1998, WIN and Struthers filed for bankruptcy, and appellants, who allege they relied on Seidman's and Logan's financial statements to buy stock in the companies, lost their investments.[1] Consequently, appellants sued both accounting firms, alleging causes of action for negligent and intentional misrepresentation. In addition, appellants alleged a cause of action for violation of California Corporations Code section 25400, subdivision (d), which outlaws assisting the sale of a security by false or misleading statements.

Respondents demurred to the complaint four times on multiple grounds. The trial court sustained each demurrer with leave to amend. Eventually, appellants filed a corrected fifth amended complaint, the broad outlines of which we have already described, leaving its particulars to our discussion below. Respondents demurred to the fifth amended complaint (hereafter the complaint) on several grounds, arguing it failed for a number of reasons to state a cause of action and pleaded fraud with insufficient detail. The court adopted respondents' arguments and sustained both demurrers without leave to amend. Its minute order added that "The complaint remains scrambled . . . and lacks essential information, i.e., Who said what to whom? When? What was the reliance?" The court entered judgment for respondents. This appeal followed.

## STANDARD OF REVIEW

" 'We treat [a] demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we

---

[1] We identify in Appendix 1 which appellants bought stock in which company.

reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the [appellant]." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

## DISCUSSION

### I. *Fraud Pleaded with Sufficient Detail*

Respondents correctly note that plaintiffs who allege fraud must plead their allegations with more detail than other causes of action. "In California, fraud must be pled specifically; general and conclusory allegations do not suffice. [Citations.] 'Thus " 'the policy of liberal construction of the pleadings . . . will not ordinarily be invoked . . . .' " [Citation.] [¶] This particularity requirement necessitates pleading *facts* which "show how, when, where, to whom, and by what means the representations were tendered." ' " (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645 [49 Cal.Rptr.2d 377, 909 P.2d 981], quoting *Stansfield v. Starkey* (1990) 220 Cal.App.3d 59, 73 [269 Cal.Rptr. 337].) Appellants' complaint alleges respondents prepared fraudulent financial statements that intentionally overstated the value of WIN's assets and deliberately misstated that those values complied with GAAP. According to respondents, the allegations are not specific enough. (See *Wilhelm v. Pray, Price, Williams & Russell* (1986) 186 Cal.App.3d 1324, 1331 [231 Cal.Rptr. 355].)

Our review of the complaint convinces us otherwise. Appellants allege Seidman's audited 1995 financial statement for WIN falsely stated it complied with GAAP, when it did not. The complaint also alleges the statement valued WIN's assets at $121,274,018, when the assets were worth only $6,951,667. Contributing particularly to WIN's inflated asset value were the following misrepresentations:

—Seidman valued WIN's broadcast licenses as worth $79,048,589, when they were actually worth less than $1 million under GAAP unless, and until, WIN and Struthers successfully merged and Struthers successfully assumed the licenses;

—Seidman valued WIN's real estate holdings as worth $28,431,335, when their value was much less unless, and until, WIN and Struthers successfully merged; and

—Seidman stated WIN owned annuities worth $6,643,427, when no such annuities existed.

The complaint also alleges the financial statement said WIN's shareholder equity was $88,190,327, although the company's liabilities exceeded its assets, making it worthless. Finally, the complaint alleges Seidman repeated substantially the same misrepresentations in its review of WIN's March 1996 quarterly balance sheet and in the pro forma filed with the Securities and Exchange Commission.

As for Logan, the complaint alleges Logan misrepresented WIN's assets in its review of WIN's August 1995 balance sheet as $145,187,871, when they were worth only $30,737,209. The review particularly misstated:

—The value of WIN's broadcast licenses as $53,915,464, when they were worth less than $1 million unless, and until, the merger was completed;

—The value of WIN's real estate as $31,735,198, when it had no value under GAAP unless, and until, the merger was completed;

—The value of WIN's intellectual property rights as $28,800,000, when they were worth far less and were perhaps even worthless; and

—That WIN owned $5,785,000 in annuities, when no such annuities existed.

Finally, the complaint alleges Logan repeated substantially the same misrepresentations in its October 1995 accountants' report of WIN's August 1995 balance sheet and its February 1996 auditors' report of WIN's December 1995 balance sheet.

The complaint thus provides enough information for respondents to know what purported falsehoods they must defend against. (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 216 [197 Cal.Rptr. 783, 673 P.2d 660] [one purpose of specificity requirement is to inform defendant about the charges that must be met] (*Children's Television*).) Demanding that appellants provide even more detail risks making an already long complaint—60 pages supported by 258 pages of exhibits—even longer. For a lengthy complaint, "perfect compliance with the specificity requirement . . . as a practical matter . . . [may] provide less effective notice and be less useful in framing the issues than would a shorter, more generalized version." (*Id.* at p. 217.) Appellants' complaint is bumping up against that principle. No more detail is needed.[2]

---

[2] Indeed, the court itself grappled with the complaint's length. During the hearing on the demurrer, the court told appellant, "You have a very complicated set of facts. You have a very complicated complaint. Your pleadings have consistently been scrambled. You have now got, what, 130 pages of pleadings, and you are leaving this for the court to [untangle]?" Revealing

## II. *Respondents' Duty to Appellants*

Respondents assert that their liability for any inaccuracies in the financial statements was only to their clients, WIN and Struthers, not to third parties. Accordingly, respondents contend appellants cannot state a cause of action for negligent or intentional misrepresentation because they owed no duty to appellants. We disagree.

In *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370 [11 Cal.Rptr.2d 51, 834 P.2d 745] (*Bily*), our Supreme Court formulated a hierarchy of duty for accountants who prepare inaccurate financial statements. Casting an ever-widening circle of obligation, *Bily* established that the more egregious the misstatement, the broader the duty:

—For *ordinary negligence*, an auditor owes a duty only to its client. As *Bily* explained, "[A]n auditor's liability for general negligence in the conduct of an audit of its client financial statements is confined to the client, i.e., the person who contracts for or engages the audit services. Other persons may not recover on a pure negligence theory." (*Bily, supra,* 3 Cal.4th at p. 406.)

—For *negligent misrepresentation*, the duty expands to specifically intended beneficiaries of the report who are substantially likely to receive the misinformation. *Bily* defined such beneficiaries as "persons who, although not clients, may reasonably come to receive and rely on an audit report and whose existence constitutes a risk of audit reporting that may fairly be imposed on the auditor. Such persons are specifically intended beneficiaries of the audit report who are known to the auditor and for whose benefit it renders the audit report." (*Bily, supra,* 3 Cal.4th at pp. 406–407.) Liability arises toward such plaintiffs when the representation was made "with the intent to induce plaintiff, or a particular class of persons to which plaintiff belongs, to act in reliance upon the representation in a specific transaction, or a specific type of transaction, that defendant intended to influence. Defendant is deemed to have intended to influence [its client's] transaction with plaintiff whenever defendant knows with *substantial certainty* that plaintiff, or the particular class of persons to which plaintiff belongs, will rely on the representation in the course of the transaction." (*Id.* at p. 414, italics added; cf. *Industrial Indemnity Co. v. Touche Ross & Co.* (1993) 13 Cal.App.4th 1086, 1095 [17 Cal.Rptr.2d 29] [auditor not liable for negligent misrepresentation to client's creditor where no evidence auditor knew client intended to use financial statement to get credit] (*Industrial Indemnity*).)

evident frustration with the difficulty of working through the complaint's density and prolixity before sustaining the demurrer without leave to amend and dismissing the action, the court stated, "You have 130 pages. You expect that I'm going to sit here and do what you did yesterday [in trying to answer each of respondents' claims of lack of specificity]?"

—For *intentional misrepresentation*, the duty expands yet further to include anyone whom the auditor should have reasonably foreseen would rely on the misrepresentations. *Bily* explained, "The representation must have been made with the intent to defraud plaintiff, or a particular class of persons to which plaintiff belongs, whom defendant intended or *reasonably should have foreseen* would rely upon the representation. One who makes a representation with intent to defraud the public or a particular class of persons is deemed to have intended to defraud every individual in that category who is actually misled thereby." (*Bily, supra,* 3 Cal.4th at p. 415, italics added.)

■  *Bily* can thus be briefly summarized as follows: (1) ordinary negligence—*no duty* to third parties; (2) negligent misrepresentation—duty to third parties who would be known with *substantial certainty* to rely on the misrepresentation; and (3) intentional misrepresentation—duty to third parties who could be *reasonably foreseen* to rely on the misrepresentation.

Respondents note *Bily* intended to limit an auditor's liability to less than the world at large by requiring plaintiffs to show more than that respondents could have anticipated unknown parties might rely on the financial statements they prepared. For liability to attach, appellants must instead identify particular people and specific transactions, or well-defined types of transactions, that respondents intended to influence. (*Bily, supra,* 3 Cal.4th at pp. 408–409; *Industrial Indemnity, supra,* 13 Cal.App.4th at pp. 1094–1095 & fn. 8.) As *Bily* explained, "If competent evidence does not permit a reasonable inference that the auditor supplied its report with knowledge of the existence of a specific transaction or a well-defined type of transaction which the report was intended to influence, the auditor is not placed on notice of the risks of the audit engagement." (*Bily,* at p. 414; see also *Industrial Indemnity,* at p. 1097 [auditor liable only to those third parties the auditor "knows is likely to rely on it in a transaction that has sufficiently specific economic parameters to permit the [auditor] to assess the risk of moving forward"].) Relying on *Bily,* respondents contend the complaint fails to state a cause of action because, first, it does not allege respondents knew that appellants planned to invest in WIN or Struthers and, second, it fails to allege respondents intended to influence such investment decisions. We conclude respondents misread the complaint.

1. Appellants Allege the Duty for Negligent Misrepresentation. The complaint alleges WIN and Struthers hired respondents to prepare various financial statements that appellants relied upon in buying WIN or Struthers stock and in approving their merger. The complaint also alleges respondents knew WIN or Struthers would distribute the statements to existing and potential shareholders for such purposes. A representative allegation is the following: "Seidman was hired by WIN to prepare certified audited statements and other

financial statements of WIN for the purpose of influencing and inducing (a) investors to purchase and/or retain WIN and Struthers securities, (b) Struthers to approve the combination of WIN and Struthers and (c) WIN and/or Struthers securities holders to approve the combination of WIN and Struthers. . . . Seidman knew that its financial statements, audit reports, and review reports would be used to influence and induce [appellants] to purchase or retain WIN and Struthers securities and to approve the combination of WIN and Struthers." Such an allegation, and similar allegations targeted at Logan, satisfy *Bily*'s criteria for negligent misrepresentation: respondents knew with substantial certainty that potential investors such as appellants would rely on the misstatements. (*Bily, supra,* 3 Cal.4th at pp. 413–414.) The complaint therefore states a cause of action for negligent misrepresentation.[3]

2. <u>Appellants Allege the Duty for Intentional Misrepresentation.</u>[4] The complaint alleges respondents either intentionally or recklessly misstated the value of WIN's assets and shareholder equity. It further alleges respondents should have foreseen that current and future investors in WIN and Struthers would rely on the misstated values in deciding whether to invest in those companies and to approve their merger. A representative allegation is the following: "Seidman's misrepresentations [of asset and equity values and compliance with GAAP] were made recklessly, without Seidman knowing whether they were true or false. [¶] . . . [¶] Seidman should have foreseen that the class of people and entities to whom or which [appellants] belong would rely on the Seidman misrepresentations. . . . [¶] Seidman should reasonably have foreseen that WIN stockholders or potential stockholders who read [the financial statements] would tell other people and the press the contents of these financial statements, particularly in light of the interest being expressed in WIN and Struthers and the announced merger of WIN and Struthers. Seidman should also have reasonably foreseen that the other people would rely upon its misrepresentations in the financial statements . . . and in so doing be misled into purchasing WIN or Struthers stock." Such allegations, and similar allegations targeted at Logan, satisfy *Bily*'s criteria for intentional misrepresentation: respondents could reasonably foresee that others such as appellants would rely on the misstatements. (*Bily, supra,* 3 Cal.4th at p. 415.) The complaint therefore states a cause of action for intentional misrepresentation.

---

[3] The following appellants *do not* claim negligent misrepresentation by respondents: Marcia Beach, Donna Kincaid, Mark Schwartzmeyer, Myra Thomas, Heather Ann Ueunten, and Senyu Ueunten.

[4] Apparently, in a word processing error, the complaint applies the subheading "Constructive Trust" to its cause of action for intentional misrepresentation against Seidman. The parties are in apparent agreement, however, that a constructive trust analysis does not apply to the cause of action, and thus we do not consider it on those terms.

3. <u>Appellants Who Bought Struthers Stock Allege Causes of Action</u>. Some appellants bought only Struthers stock.[5] Respondents note that Struthers hired Seidman, but not Logan, to prepare its financial statements. According to respondents, Struthers appellants therefore cannot state a cause of action against Logan because Struthers was not Logan's client and thus owed no duty to Struthers' shareholders for any misstatements.

■ *Bily* imposes on respondents a duty to more than just their clients. Respondents owed a duty to anyone whom they (1) should have reasonably foreseen would rely on their intentional misrepresentations, or (2) knew with substantial certainty would rely on their negligent misrepresentations. (*Bily, supra,* 3 Cal.4th at pp. 413–415.) The complaint alleges respondents knew the proposed merger of WIN and Struthers would induce investors in Struthers to rely on financial statements about WIN in anticipation of the two companies becoming one. In addition, the complaint alleges respondents knew Struthers investors would rely on WIN's financial statements in deciding whether to approve the merger itself. The complaint therefore alleges a duty from respondents to Struthers' shareholders, making respondents liable to those shareholders for their misrepresentations.

III. *Reliance*

1. <u>Sufficient Detail</u>. Logan contends the complaint does not describe appellants' reliance on Logan's alleged misrepresentations with enough detail. According to Logan, appellants must identify the "when, where, and how" of their reliance. Our review finds most appellants describe their reliance on WIN's inflated assets with enough specificity, often including the precise date they bought stock in the company and the amount paid, to permit respondents to prepare a defense. (*Children's Television, supra,* 35 Cal.3d at p. 216.) Set forth below is a summary of their alleged reliance. Although our lengthy summary borders on tedious, we undertake it to highlight the amount of detail appellants did in fact allege—and which respondents and the trial court apparently ignored—as appellants struggled to balance the complaint's specificity against its unwieldiness.[6] (*Children's Television,* at p. 216.)

---

[5] We identify those appellants in the last paragraph of Appendix 1.

[6] A typical allegation reads: "Plaintiffs Robert E. and Elza Burton obtained and reviewed Seidman's 12/31/95 audited financial statement (Exhibit A) and Logan's 8/31/95 (Exhibits B and B-1) and 12/31/95 (Exhibit B-2) audited financial statements shortly after they were issued. These financial statements conveyed to Plaintiffs Robert E. and Elza Burton the firm impression that the Company and its subsidiaries were strong with a lot of assets and had a great chance of success, and that investments in the Company and/or its subsidiaries were likely to be highly profitable. The financial statements also disclosed the proposed merger between WIN and Struthers. On this basis, the various purchases were made by Plaintiffs Robert E. and Elza Burton. The strong financial statements are also the reason that Plaintiffs Robert E. and Elza Burton did not sell any of the stock that they had purchased. Plaintiffs Robert E.

—Marcia Beach: Alleges she bought Struthers stock between March 1996 and January 1997 based on what someone else told her about the Logan reports. (We discuss, *post*, whether relying on a third person is actionable reliance.)

—Ronald and Sandra Bell: Allege they received a copy of Logan's February 1996 independent auditors' report in the spring of 1996 and relied on it.

—Ralph and Jean Bjorklund: Allege they bought Struthers stock in 1996, and did not sell their WIN stock, based on the statements they had read in Logan's reports after they came out.

—Robin Buettner: Alleges she received Logan's reports in late 1995 and 1996 and relied on them not to sell her WIN stock. (We discuss, *post*, whether forbearing from selling stock constitutes actionable reliance.)

—Marion and Ester Burns: Allege they received Logan's reports when they came out and relied on them to buy WIN stock and not sell it later.

—Robert and Elza Burton: Allege they bought Struthers stock between February 1996 and April 1997 based on their review of Logan's reports after they came out.

—Capital Hills Holdings Corp.: Alleges it decided not to sell its WIN stock based on its review of Logan's reports after they came out.

—John Cupples: Alleges he decided not to sell his Struthers stock based on his review of Logan's reports after they came out.

—Energex Corporation: Alleges it decided not to sell its WIN stock based on its review of Logan's reports after they came out.

—Jai Gupta: Alleges he decided not to sell his WIN stock based on his review of Logan's reports after they came out.

—John and Becky Iosue: Allege they received Logan's audited financial statement in February 1996 and relied on it to buy Struthers stock several times between February 1996 and June 1997.

---

and Elza Burton bought the following amount of Struthers' stock on the specified dates: 2/20/96—$10,728.00; 2/23/96—$10,103.00; 1/14/97—$3,563.50; 1/17/97—$5,511.50; 1/27/97—$10,123; and 4/15/97—$2,658.00."

—Dan Jones: Alleges he bought, and decided not to sell, WIN stock between August 1995 and September 1996 after he reviewed Logan's statements when they came out.

—Maureen Jones: Alleges she relied on Logan's statements before, first, agreeing to accept WIN stock as compensation for work she 'performed for WIN and, second, buying WIN stock between the fall of 1995 and May 1997.

—Richard Katzman: Alleges he decided not to sell his WIN stock based on his review of Logan's reports after they came out.

—Paul, Bobbie, Joseph, Kilma, Robert, and John Kouri: Allege Paul Kouri bought WIN stock for himself and his family between December 1995 and September 1996 based on his review of Logan's reports after they came out.

—Gary Lewkovich: Alleges he bought Struthers stock between April 1996 and July 1997 based on his review of Logan's reports after they came out.

—Patsy Linder: Alleges she decided not to sell her WIN stock, and between June 1996 and November 1997 bought Struthers stock, based on her review of Logan's reports after they came out.

—Harold Lobaugh: Alleges he bought Struthers stock between June and December 1997 based on his review of Logan's statement after they came out.

—Jim and Elizabeth Loomis: Allege they bought WIN stock in January 1996 based on their review of Logan's reports after they came out.

—Marlis Limited Partnership: Alleges it bought WIN stock between June 1995 and June 1996 based on its review of Logan's reports after they came out.

—Michael Murphy: Alleges he bought, and decided not to sell, WIN stock between May 1995 and January 1997 based on his review of Logan's reports after they came out.

—Mutual Investment Club of Texarkana: Alleges it bought Struthers stock between June and September 1996 based on its review of Logan's reports after they came out.

—Gregory Neely: Alleges he bought Struthers stock between October 1996 and July 1997 based on his review of Logan's reports after they came out.

—James and Deborah Nelson: Allege they bought Struthers stock between March 1996 and December 1997 based on their review of Logan's reports after they came out.

—Peter Olson: Alleges he bought WIN stock in August 1996 based on his review of Logan's reports after they came out.

—Louis and Norma Penner: Allege they relied on Logan's reports in deciding not to sell WIN stock they had bought in July 1995.

—Doug, Michael and Patricia Phillips, Trustees of the Kathryn Phillips Testamentary Trust: Allege they relied on Logan's reports in deciding not to sell WIN stock they had bought in July 1995.

—Thomas Rolfe: Alleges he bought WIN stock in May 1996 based on his review of Logan's reports after they came out.

—Scott Seymour: Alleges he bought, and decided not to sell, WIN stock between May 1995 and January 1996 based on his review of Logan's reports after they came out.

—Ski Run Marina, Inc.: Alleges it relied on Logan's reports in deciding not to sell WIN stock it had bought in July 1995.

—Vann Streety: Alleges he bought Struthers stock between September 1996 and January 1998 based on his review of Logan's reports after they came out.

—Mark Thornwall and Dona M. Thornwall: Allege they bought Struthers stock between September 1995 and October 1997 based on their review of Logan's reports after they came out.

—Ernest Toma: Alleges he bought WIN stock in September 1996 based on his review of Logan's reports after they came out.

—Dennis Tovey: Alleges he bought Struthers and WIN stock between September 1995 and December 1997 based on his review of Logan's reports after they came out.

—Valero Development, Inc.: Alleges it bought WIN stock in November 1996 based on its review of Logan's reports after they came out.

—Charlotte and Terry Voss: Allege they bought Struthers stock in June 1996 based on their review of Logan's reports after they came out.

—Maureen Wagstaff: Alleges she relied on Logan's statements before, first, agreeing to accept WIN stock as compensation for work she performed for WIN and, second, buying WIN stock between the fall of 1995 and May 1997.

—Judith and William Winkler, Jr.: Allege they bought Struthers stock in September 1995 after reviewing Logan's report that month.

—Wireless Ventures Preferred Investors: Alleges it bought Struthers stock between October 1996 and July 1997 based on its review of Logan's reports after they came out.

Logan is correct, however, as to some appellants. The following do not provide any details about their reliance and thus fail to state a cause of action:

—Robert Boyter: Alleges he bought Struthers stock based on the proposed merger's large asset base, but does not identify what statements he relied upon.

—Branch Investment Group LLC: Alleges it reviewed Logan's reports when they came out, but does not describe the timing and amount of any stock it bought, sold, or held.

—Salvatore Federico: Alleges he reviewed Logan's reports before he decided to buy WIN and Struthers stock, but does not say when he made the investment.

—Walter Forsyth: Alleges he "believes" he saw Logan's February 1996 report before he bought WIN and Struthers stock between April 1996 and July 1997.

—Stephen Hyden: Alleges he "believes" he saw Logan's February 1996 report before he bought Struthers stock between September 1996 and June 1997.

Because these last five appellants fail to state a cause of action, the trial court properly sustained respondents' demurrers as to them.

2. Forbearance Is Reliance. A number of appellants, whom we identify in Appendix 2, bought WIN or Struthers stock before Logan and Seidman issued their first reports, and thereafter relied on respondents' rosy misstatements in deciding not to sell their stock.[7] Respondents contend that holding

---

[7] Respondents misidentify a number of appellants as doing no more than not selling their stock in reliance on respondents' misstatements. In fact, such appellants also allege buying stock after respondents issued their statements. We correctly identify them in Appendix 3.

onto stock, in contrast to selling or buying it, is not actionable reliance. Thus, according to respondents, the court correctly dismissed "holding" appellants for failing to state a cause of action.[8]

■ After briefing ended in this appeal, our Supreme Court held in *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167 [132 Cal.Rptr.2d 490, 65 P.3d 1255] (*Small*) that holding stock can be actionable reliance.[9] (*Id.* at pp. 170–171.) Thus, those appellants who held WIN or Struthers stock in reliance on respondents' misstatements can allege a cause of action. The trial court therefore erred to the extent it dismissed "holding" appellants for not having alleged reliance.

*Small's New Pleading Rule*: In addition to holding forbearance can be reliance, the *Small* court announced that plaintiffs who rely on a forbearance theory must plead how many shares they would have sold and when they would have sold them.[10] (*Small, supra,* 30 Cal.4th at p. 184.) Because such requirements were new, the *Small* court directed the trial court to grant the plaintiff there leave to amend her complaint to add such allegations. Following *Small's* guidance here, we direct the trial court to grant the "holding" appellants leave to amend the complaint to specify how many shares they would have sold and when they would have sold them.

3. "Grapevine" Plaintiffs. Some appellants did not read or otherwise directly rely on the Logan or Seidman financial statements.[11] Instead, they relied on what others told them the statements said. Respondents argue such indirect reliance by those appellants, whom they call "grapevine plaintiffs," does not constitute legal reliance and is thus not actionable.

■ The law is otherwise. Indirect reliance is actionable if Logan or Seidman had reason to know others would convey their misrepresentations to appellants. Under *Bily*, respondents are liable for (1) negligent misrepresentation if they knew it was substantially certain that appellants would receive the misstatements and (2) intentional misrepresentation if it was reasonably foreseeable appellants would receive the statements. Thus, nothing in *Bily's* formulation of negligent or intentional misrepresentation precludes indirect

---

[8] Because WIN's stock was not publicly traded, it is unclear whether selling the stock was practically feasible. Nonetheless, because WIN's shareholders had the right to rescind their purchases and demand the return of the stock's purchase price, their forbearance consisted of not exercising their right of rescission.

[9] The parties submitted supplemental briefs discussing *Small's* effect on this appeal.

[10] The court's discussion referred only to negligent misrepresentation, but we see nothing in the opinion or public policy that precludes its application to intentional misrepresentation, conduct which by definition is more egregious.

[11] We identify them in Appendix 4.

reliance. (See also *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1095–1097 [23 Cal.Rptr.2d 101, 858 P.2d 568] [allows indirect liability for misrepresentations if defendant had reason to know misrepresentation will be forwarded] (*Mirkin*).)[12] Accordingly, the "grapevine" appellants state claims for negligent and intentional misrepresentation notwithstanding their indirect reliance on Logan's and Seidman's misstatements.

Respondents' contention is well-taken, however, as to certain appellants who do not expressly allege relying on any Logan or Seidman misstatement, whether directly or indirectly. Because they do not allege reliance, the trial court properly dismissed them for failing to state a claim for negligent or intentional misrepresentation. Those appellants are: Michael Benkert; Daniel, Ethel, Patrick and Wence DiBala; Jason Edwards; Donna Kincaid; Deanna Polani; Steven Schulman; and Heather Ann Ueunten.

4. <u>Reasonableness of Reliance</u>. Logan argues reliance on any of its misstatements was unreasonable for several reasons. None is persuasive.

a. *Logan's disclaimers*: Logan attached several qualifications to its statements about WIN and Struthers. According to Logan, these qualifications should have alerted appellants that Logan's reports might be inaccurate, making appellants' reliance on the statements unreasonable. Logan's first qualification was a "going concern" disclaimer contained in Logan's February 9, 1996, independent auditors' report. It warned Logan had "substantial doubt" about WIN's ability to stay in business if its proposed merger with Struthers failed. Logan cites authority that a going concern disclaimer is a conspicuous red flag of a company's financial shakiness and an investment's

---

[12] In *Mirkin*, our Supreme Court rejected the fraud-on-the-market doctrine for common law fraud. (*Mirkin, supra*, 5 Cal.4th at p. 1108; *Small, supra*, 30 Cal.4th at p. 179.) Under that doctrine, a plaintiff need not prove direct reliance on a misstatement; instead, the plaintiff need only show the misstatement affected the stock's trading price on the open market. (*Mirkin*, at p. 1089; see also *id.* at pp. 1108–1109 (conc. opn. of Kennard, J.).) The advent of *Small* appears to foretell a policy shift eyeing a dawning awareness that all is not right with the securities markets and the accountants who are supposed to police them. As *Small* observed, "The last few years have seen repeated reports of false financial statements and accounting fraud, demonstrating that many charges of corporate fraud were neither speculative nor attempts to extort settlement money, but were based on actual misconduct. 'To open the newspaper today is to receive a daily dose of scandal, from Adelphia to Enron and beyond. Sadly, each of us knows that these newly publicized instances of accounting-related securities fraud are no longer out of the ordinary, save perhaps in scale alone.' [Citation.] The victims of the reported frauds, moreover, are often persons who were induced to hold corporate stock by rosy but false financial reports, while others who knew the true state of affairs exercised stock options and sold at inflated prices. [Citation.] Eliminating barriers that deny redress to actual victims of fraud now assumes an importance equal to that of deterring nonmeritorious suits." (*Small*, at p. 181.) Although it is for our Supreme Court, not us, to decide the question, recent events support revisiting the fraud-on-the-market doctrine.

riskiness. Based on that authority, Logan argues it was unreasonable for appellants to rely on the report.

Logan's argument misses the mark, however, because Logan was obligated to be truthful in its statements regardless of the precariousness of WIN's finances. Logan's February report stated that the values it assigned to WIN's assets complied with generally accepted accounting principles, which appellants allege was false. Logan's going concern qualification does not address that assertion, nor the reasonableness of appellant's reliance on it.

Logan's second qualification rested on the difference between an accountant's review and an audit. Logan argues a review is less searching than an audit, rendering appellants' reliance on any statements in a review unreasonable as a matter of law. For example, Logan notes its November 24, 1995, review stated, "All information included in these financial statements is the representation of the management of World Interactive Network, Inc.," and Logan did not express "an opinion regarding the financial statements taken as a whole." In addition, its October 12, 1995, independent accountants' report similarly expressed no "opinion regarding the financial statements taken as a whole."

■ Again, Logan's argument misses the mark. Appellants allege Logan falsely stated the financial statements complied with generally accepted accounting principles. An accountant may not issue an intentionally false document of whatever type, whether styled as a review or audit. (Cal. Code Regs., tit. 16, § 58 ["Licensees engaged in the practice of public accountancy shall comply with all applicable professional standards, including but not limited to generally accepted accounting principles and generally accepted auditing standards"].) Thus, even if reviews are less rigorous than audits, the relaxed standards were not a license to misrepresent, and Logan was therefore still obligated to be truthful whatever the nature of its report. (*Bily, supra,* 3 Cal.4th at p. 383; Cal. Code Regs., tit. 16, § 58.3 [accountant may not issue report on unaudited financial statements to client or others without complying with professional standards].) Therefore, the fact that some of Logan's reports were reviews, not audits, has no bearing on the reasonableness of appellants' reliance on Logan's assertion that the reports complied with generally accepted accounting principles.

b. *Duty to investigate*: Logan argues appellants had a duty to investigate Logan's statements. As Logan notes, investors cannot turn a blind eye to a known risk involving a company. (*Atari Corp. v. Ernst & Whinney* (1992) 981 F.2d 1025, 1030–1031.) In support, Logan cites language in *Bily* noting that "Investment and credit decisions are by their nature complex and multifaceted. Although an audit report might play a role in such decisions,

reasonable and prudent investors and lenders will dig far deeper in their 'due diligence' investigations than the surface level of an auditor's opinion." (*Bily, supra,* 3 Cal.4th at pp. 400–401 [11 Cal. Rptr.2d 51, 834 P.2d 745].) Logan's contention is unavailing, however, because regardless of whether investors *should* rely *solely* on an auditor's report when investing, it seems unassailable that they may assume an auditor's statements are truthful. Logan's argument thus amounts to the claim that if appellants had looked more closely into WIN's finances, appellants would have discovered that Logan's statements were false. To state such a proposition is to reveal its unsoundness.

c. *Statute of frauds*: Logan argues the statute of frauds barred appellants from relying on what anyone, including Logan, said about WIN's financial statements. (Code Civ. Proc., § 1974.) In pertinent part, the statute refers to statements about someone else's creditworthiness. As such, it applies only to claims by creditors. (See *Grant v. U.S. Electronics Corp.* (1954) 125 Cal.App.2d 193, 198 [270 P.2d 64] ["Section 1974 is applicable only when the primary object of the representations is to induce the procurement of credit to a third person"]; *Bank of America v. Western Constructors* (1952) 110 Cal.App.2d 166, 169 [242 P.2d 365] ["A test, if not the sole test, for determining whether a misrepresentation is within the statute, is whether the representation induced the recipient thereof to enter into a transaction which resulted in a debt due to him from the third person"].) Having bought stock in WIN and Struthers, appellants were investors in the companies, not creditors. Accordingly, the statute does not apply.

IV. *Appellants Fail to State a Corporations Code Section 25400 Claim*

Corporations Code section 25400 prohibits making false or misleading statements to assist the sale of a security. (§ 25400, subd. (d).) Appellants allege respondents' financial statements violated that statute. Appellants cannot, however, state a cause of action for that violation because the statute's language limits liability to actual sellers or buyers of, or someone who offers to buy or sell, a security. (§ 25400 [applies to "a broker-dealer or other person selling or offering for sale or purchasing or offering to purchase" a security]; *Kamen v. Lindly* (2001) 94 Cal.App.4th 197, 206 [114 Cal.Rptr.2d 127] (*Kamen*).) Because respondents did not buy or sell WIN or Struthers stock, or offer to do so, the statute does not apply to them.

Appellants argue the statutory limitation is bad public policy and decisions such as *Kamen* that impose such a limit are wrongly decided. In appellants' view, liability under Corporations Code section 25400 should extend to anyone who makes a misrepresentation. In support of a "no sale" require-ment, they cite *Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1048 [80 Cal.Rptr.2d 828, 968 P.2d 539], but it is inappo-site. That case addressed whether section 25400 applied only to sales of

securities inside California, or also covered sales outside the state. In its discussion, the court in passing mentioned that an actual sale need not have occurred—which is true, because the statute also covers *offers* to sell. (*Id.* at pp. 1047–1048.) The court's comment cannot be understood, however, to have overridden the statutory language limiting liability to someone who is an actual, or potential, buyer or seller. (See *StorMedia Inc. v. Superior Court* (1999) 20 Cal.4th 449, 456–463 [84 Cal.Rptr.2d 843, 976 P.2d 214] [statute applies to someone who sells or offers to sell a security]; *Reiger v. Altris Software, Inc.* (S.D.Cal. Apr. 3, 1999, No. 98-CV-528 TW) 1999 U.S.Dist. LEXIS 7949 [Fed.Sec.L.Rep. 90,491, pp. 92353–92354] ["statute was not intended to reach defendants [such as independent auditors] who did not directly participate in the sale of securities or some other 'market activity' "].) Accordingly, the trial court properly sustained respondents' demurrers that appellants could not state a cause of action under section 25400.

V. *No Bankruptcy Bar*

Logan contends appellants' failure to assert claims in WIN's bankruptcy proceedings bars the complaint. In support, Logan relies on *Federated Management Company v. Latham & Watkins* (2000) 742 N.E.2d 684 [138 OhioApp.3d 815], a solitary out-of-state decision by an intermediate appellate court holding that creditors suing lawyers of a bankrupt company for fraud and misrepresentations were obligated to pursue their claims in bankruptcy court. Such a case does not establish any such proposition binding in California, nor does Logan advance any argument how the Ohio court's analysis or holding applies here. We therefore pass on the issue.

## DISPOSITION

The trial court's judgment is reversed in part and affirmed in part. The trial court is directed to enter a new and different order:

Sustaining the demurrers without leave to amend to appellants' cause of action for violation of Corporations Code section 25400;

Sustaining the demurrers without leave to amend for failing to allege reliance by Michael Benkert; Daniel, Ethel, Patrick and Wence DiBala; Jason Edwards; Donna Kincaid; Deanna Polani; Steven Schulman; and Heather Ann Ueunten;

Sustaining the demurrers without leave to amend for failing to allege reliance with sufficient detail by Robert Boyter, Branch Investment Group LLC, Salvatore Federico, Walter Forsyth, and Stephen Hyden; and

Overruling the demurrers in all other respects as to all other appellants, except for those appellants who allege they continued to hold their stock in reliance on respondents' misrepresentations. As to those "holding" appellants, the court is directed to grant them leave to amend the complaint to allege how many shares of stock they would have sold and when.

Appellants to recover their costs on appeal.[13]

Cooper, P. J., and Boland, J., concurred.

A petition for a rehearing was denied December 24, 2004, and the opinion was modified to read as printed above. Respondents' petitions for review by the Supreme Court were denied March 24, 2004. Baxter, J., and Chin, J., were of the opinion that the petitions should be granted.

APPENDIX 1

The following appellants bought stock in both companies: Rebecca Bloom; F. Walter Bloom III; Michael Blott; John Chess, Trustee for Lorraine Dooley and Dorothy Chess Trust; and Marlis Limited Partnership.

The following appellants bought only WIN shares: Michael Murphy; Advance Multi-Media Concepts, Inc.; Michael Ahn; Thomas Ahn; Michael Benkert; David Bingaman; Jean Bjorklund; Ralph Bjorklund; Branch Investment Group LLC; Robin Buettner; Esther Burns; Marion Burns; Capital Hills Holdings Corp.; Sean Corrigan; Energex Corporation; Salvatore Federico; Shirley Fletcher, Ron Fletcher and Wenman Fletcher, Trustees of the Fletcher Family Trust; Walter Forsyth; Jai Gupta; Dan Jones; Maureen Jones; Richard Katzman; Donna Kincaid; Bobbie Kouri; John Kouri; Joseph Kouri; Kilma Kouri; Robert Kouri; Paul Kouri; Patsy Linder; Jim and Elizabeth Loomis; Peter Olson; Louis Penner; Norma Penner; Thomas Rolfe; Scott Seymour; Ski Run Marina, Inc.; Vaco Jarrett & Associates; Valero Development, Inc.; Vernon Pudwill Company; Maureen Wagstaff; and Wireless Ventures Preferred Investors.

The following appellants bought only Struthers stock: Ron Anliker; Vicky Anliker; Marcia Beach; Ronald Bell; Sandra Bell; Robert Boyter; Elza Burton; Robert Burton; Clifford Chin; Bernice Cohn; Stanley Cohn; John Cupples; Daniel DiBala; Ethel DiBala; Patrick DiBala; Wence DiBala; Jason Edwards; Steven Hohf; Stephen Hyden; Becky Iosue; John Iosue; Jayesh

---

[13] We acknowledge that some appellants do not prevail on appeal and thus would ordinarily not be entitled to recover their costs. But, given the administrative complexity, if not impossibility, of untangling what, if any costs, are solely attributable to those appellants—and that such marginal costs are in all likelihood de minimis—we exercise our discretion not to single those appellants out for nonrecovery. (Cal. Rule of Court, rule 27(a)(4).)

Keshav; James King; Rebecca King; Gary Lewkovich; Patsy Linder; Harold Lobaugh; Jennifer Maddalozza; John Maddalozza; Mutual Investment Club of Texarkana; Gregory Neely; Deborah Nelson; James Nelson; Doug Phillips; Michael and Patricia Phillips, Trustees of the Kathryn Phillips Testamentary Trust; Deanna Polani; Steven Schulman; Mark Schwartzmeyer; Vann Streety; Myra Thomas; Dona Thornwall; Mark Thornwall; Ernest Toma; Dennis Tovey; Heather Ann Ueunten; Senyu Ueunten; Alfredo Villanueva; Charlotte Voss; Terry Voss; Judith Winkler; William Winkler, Jr.; and Nancy Wood.

### APPENDIX 2

The following appellants alleged liability solely on their deciding not to sell their stock in reliance on respondents' statements: Robin Buettner; Capital Hills Holdings Corp.; John Cupples; Energex Corporation; Richard Katzman; Louis and Norma Penner; Doug Phillips, Michael and Patricia Phillips, Trustees of the Kathryn Phillips Testamentary Trust; Deanna Polani; Ski Run Marina, Inc.; Vaco Jarret & Associates; and Vernon Pudwill Company.

### APPENDIX 3

The following appellants bought stock after Logan issued its first report in November 1995: Ronald Bell and Sandra Bell; F. Walter and Rebecca Bloom; Michael Blott; Stanley and Bernice Cohn; Paul, Bobbie, Joseph, Kilma, Robert and John Kouri; Patsy Linder; Jim and Elizabeth Loomis; Marlis Limited Partnership; Michael Murphy; Thomas Rolfe; Scott Seymour; Dennis Tovey; Vaco Jarrett & Associates; Vernon Pudwill Company; Maureen Wagstaff; and Judith and William Winkler, Jr.

The following appellants bought stock after Seidman issued its first report in February 1996: Michael Ahn; Thomas Ahn; Ronald and Vicki Anliker; Ralph and Jean Bjorklund; F. Walter and Rebecca Bloom III; Michael S. Blott; Marion and Ester Burns; Stanley and Bernice Cohn; Ron Fletcher and Wenman H. and Shirley H. Fletcher, Trustees of the Fletcher Family Trust; Dan Jones; Maureen Jones; Donna Kincaid; Paul Kouri; Patsy Linder; John and Jennifer Maddalozza; Marlis Limited Partnership; Michael Murphy; Mark and Dona M. Thornwall; Dennis Tovey; Heather Ann Ueunten; Senyu Ueunten; Maureen Wagstaff; and Judith and William Winkler, Jr.

### APPENDIX 4

Appellants who indirectly relied on respondents' statements: Marcia Beach; Michael Benkert; Daniel, Ethel, Patrick and Wence DiBala; Walter Forsyth; Steven Hohf; Stephen Hyden; Donna Kincaid; Deanna Polani; Steven Schulman; Mark Schwartzmeyer; Myra Thomas; Heather Ann Ueunten; and Senyu Ueunten.